# HOPKINS & SCHAFKOPF, LLC
### ATTORNEYS AT LAW

November 2, 2017

U.S. District Court, ED of PA
Office of the Clerk of Court
U.S. Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106

**Re: Sherman Hart v. Gerald J Pomerantz Esq and Gerald Jay Pomerantz & Associates PC**

To Whom It May Concern:

    Enclosed please find one (1) original and one (1) copy of Plaintiff's Civil Action Complaint, along with a CD containing a pdf version of same and a check in the amount of $400.00, in regards to the above captioned matter.

    Kindly file the original Complaint and return a time-stamped copy to the undersigned along with the Civil Action Summonses.

Sincerely,

Gary Schafkopf, Esq.

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Sherman Hart

**DEFENDANTS**
Gerald J Pomerantz Esq and Gerald Jay Pomertantz & Associates

**(b)** County of Residence of First Listed Plaintiff   Jefferson County Kentucky
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Philadelphia County , PA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Schafkopf Law LLC 11 Bala Ave Bala Cynwyd PA 19004 610-664-5200
Weisberg Law 7 South Morton Ave Morton PA 19070 610-690-0801

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☒ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332
Brief description of cause:
Legal Malpractice

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE                     DOCKET NUMBER

DATE
11/02/2017

SIGNATURE OF ATTORNEY OF RECORD
*Gary Schafkopf*

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: ___1062 Cecil Ave Louisville KY 40211___

Address of Defendant: ___21 South 12th Street Floor 7 Philadelphia PA 19107___

Place of Accident, Incident or Transaction: ___Philadelphia PA___
(Use Reverse Side For Additional Space)

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))   Yes☐   No☒

Does this case involve multidistrict litigation possibilities?   Yes☐   No☒
*RELATED CASE, IF ANY:*
Case Number: _____   Judge _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes☐   No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes☐   No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?   Yes☐   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes☐   No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☒ All other Diversity Cases
    (Please specify) **Legal Malpratice**

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I,_____, counsel of record do hereby certify:
☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☐ Relief other than monetary damages is sought.

DATE: _____   _____   _____
                         Attorney-at-Law            Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __11/2/17__   *Guy Schaffey*   ___83362___
                    Attorney-at-Law      Attorney I.D.#

CIV. 609 (5/2012)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Sherman Hart | : | CIVIL ACTION |
| v. | : | |
| Gerald J Pomerantz, Esq et al | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court.  (See reverse side of this form for a detailed explanation of special
management cases.)          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.     (X)

| | | |
|---|---|---|
| 11/2/17 | Gary Schafkopf, Esq | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 610-664-5200 | 888-283-1334 | gary@schaflaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**Civil Justice Expense and Delay Reduction Plan**
**Section 1:03 - Assignment to a Management Track**

(a)        The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)        In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management.  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)        The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)        Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)        Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

**SPECIAL MANAGEMENT CASE ASSIGNMENTS**
**(See §1.02 (e) Management Track Definitions of the**
**Civil Justice Expense and Delay Reduction Plan)**

Special Management cases will usually include that class of cases commonly referred to as "complex litigation"  as that term has been used in the Manuals for Complex Litigation.  The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985.  This term is intended to include cases that present unusual problems and require extraordinary treatment.  See §0.1 of the first manual.  Cases may require special or intense management by the court due to one or more of the following factors:  (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition.  It may include two or more related cases.  Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues.  See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

WEISBERG LAW
Matthew B. Weisberg, Attorney ID No.: 85570
7 South Morton Ave.
Morton, PA 19070
610-690-0801
Fax: 610-690-0880
**Attorney for Plaintiffs**

SCHAFKOPF LAW, LLC
Gary Schafkopf, Attorney ID No. 83362
11 Bala Ave
Bala Cynwyd, PA 19004
610-664-5200 Ext 104
Fax: 888-238-1334
**Attorney for Plaintiffs**

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SHERMAN HART**<br>1062 Cecil Ave<br>Louisville, KY 40211<br><br>Plaintiff,<br>v.<br><br>**GERALD J POMERANTZ, ESQ.**<br>21 South 12th Street Floor 7<br>Philadelphia PA 19107<br><br>and<br><br>**GERALD JAY POMERANTZ &**<br>**ASSOCIATES, P.C.**<br>21 South 12th Street Floor 7<br>Philadelphia PA 19107<br><br>Defendants. | No.<br><br>**JURY OF TWELVE (12) JURORS**<br>**DEMANDED** |

## PARTIES, VENUE and JURISDICTION

1. Plaintiff, Sherman Hart, is an adult individual residing at the above captioned address.

2. Defendant Gerald Pomerantz, Esquire (hereinafter "Pomerantz"), is an attorney licensed to practice in Pennsylvania, and at all times relevant hereto was a shareholder and/or principal of Defendant Gerald Jay Pomerantz & Associates, P.C., with an address set forth above.

3. Defendant Gerald Jay Pomerantz & Associates, P.C., is a professional corporation incorporated in with an address set forth above.

4.  Jurisdiction in this Honorable Court is based on a violation of federal law conferred by 28 U.S.C §1331 and diversity is conferred by 28 U.S.C. §1332; supplemental jurisdiction over state law claims is granted by 28 U.S.C §1367.

5.  Venue lies in this district in that the events giving rise to this claim occurred here, at least one (1) Defendant resides, maintains a principal place of business, and/or does business here, and/or the property which is the subject of this action is situated within this district.

## OPERATIVE FACTS

6.  In 2014, Plaintiff Sherman Hart was an employee of The Coca-Cola Company working in Philadelphia.

7.  On October 22, 2014, Plaintiff sustained an injury while in the course and scope of his employment for the employer. Plaintiff suffered back and leg injuries as a result of this workplace injury.

8.  On the same day, Plaintiff went to the emergency room at Aria Health Frankford—where the examining doctor concluded that he had suffered a back strain (and prescribed medications for pain and muscle spasms for Plaintiff). Copy of discharge instructions attached hereto as **Exhibit "A"**.

9.  At all times relevant, Defendant, Gerald J. Pomerantz & Associates, P.C., acted by and through its agent, Defendant, Pomerantz.

10. Pomerantz undertook representation of Plaintiff with regard to injuries sustained in Plaintiff's workplace accident on October 22, 2014. Upon information and belief, the representation agreement is in Defendants' possession.

11. On December 4, 2014, the employer issued a Notice of Compensation Payable, accepting liability for a "lumbar sprain/strain" and pursuant thereto Plaintiff began receiving

12.  The benefits received totaled $277.35 for missed pay and $1203.94 for the costs of some physical therapy appointments.

13.  On December 5, 2014, the employer terminated Plaintiff's employment.

14.  After Plaintiff was terminated, Plaintiff sought treatment from the employer's onsite medical facility regarding the work injury, but was denied this treatment because he no longer had access as an employee.

15.  On March 27, 2015, the employer filed a petition to suspend Plaintiff's compensation benefits, alleging that as of October 23, 2014, Plaintiff had returned to work without a wage loss.

16.  On May 27, 2015, Plaintiff was deposed in Pomerantz's law offices by the employer's attorney, in lieu of live testimony at trial. Copy of Plaintiff's deposition attached hereto as **Exhibit "C".**

17.  Plaintiff testified that while he continued to suffer from his back injury, Pomerantz had not referred him to any physicians. **Exhibit C**, p. 20.

18.  On June 3, 2015, Dr. Christian Fras, MD (hereinafter "Dr. Fras") performed an Independent Medical Evaluation of Plaintiff. During this evaluation, Dr. Fras did not review any diagnostic or imaging studies of Plaintiff's back injuries, nor did he perform a physical examination of Plaintiff's condition. Dr. Fras's evaluation of Plaintiff consisted solely of asking Plaintiff a few questions, and stating that he could not check Plaintiff.

19.  On July 9, 2015, there was a hearing on the employer's petition to suspend compensation benefits. Despite having undertaken representation of Plaintiff months prior, Pomerantz had not entered his appearance before the court at this time. Pomerantz failed to attend this hearing.

20. On July 13, 2015, Pomerantz entered his notice of appearance with the judge as representing Plaintiff regarding the suspension and termination of Plaintiff's compensation benefits. Notice of Appearance attached hereto as **Exhibit "D"**.

21. On July 16, 2015, the employer filed a petition to terminate benefits based on the medical opinion of Dr. Fras, who opined that Plaintiff had fully recovered from his work related injuries as of June 3, 2015.

22. Plaintiff suffered pain from continuing nerve damage to his back resulting from his work-related injury, and continued to require medical treatment and rehabilitation.

23. On July 23, 2015, Dr. Lawrence Goren, MD was deposed by employer's attorney in lieu of his live trial testimony before the workers' compensation judge. Copy of Goren's deposition attached hereto as **Exhibit "E"**.

24. A notice of this deposition had been sent to Pomerantz, dated July 8, 2015. *See* **Exhibit E,** ex. "D-Goren-1". Pomerantz called employer's attorneys the morning of the deposition to indicate that he would not be attending, and that he did not want to participate by phone, but that they should proceed as scheduled. **Exhibit E,** p. 3.

25. On September 25, 2015, Dr. Fras was deposed by employer's attorney in lieu of his live testimony before the workers' compensation judge. Copy of Fras's deposition attached hereto as **Exhibit "F"**.

26. Despite having received notice of this deposition, Pomerantz contacted the employer's attorneys earlier in the week to inform them that he would not be participating in Dr. Fras's deposition. **Exhibit F,** p. 4. Pomerantz failed to attend Dr. Fras's deposition. *Id.* at 2.

27. On October 21, 2015, the record closed for admitting evidence regarding the suspension and termination of Plaintiff's compensation benefits. While the record contained four witnesses

and five exhibits presented by the employer, Pomerantz had only presented evidence in the form of Plaintiff's own testimony.

28. Prior to the record closing, Plaintiff had told Pomerantz about witnesses who could have supported Plaintiff's testimony, but Pomerantz failed to present this evidence.

29. Whenever Plaintiff told Pomerantz about Plaintiff's difficulties in obtaining medical treatment or prescriptions for treatment from Coca-Cola, Pomerantz encouraged Plaintiff to keep waiting because "it takes time."

30. During Pomerantz's representation of Plaintiff, Plaintiff tried to obtain medical treatment. Because Pomerantz failed to help Plaintiff find treatment and have it covered by worker's compensation, Plaintiff was constrained to pay out of pocket for treatment. Plaintiff had to travel multiple times down to Louisville, Kentucky, where his family lives and where Plaintiff was able to see a massage therapist who treated Plaintiff at a discount because of a friend's referral.

31. January 19, 2016 was the deadline for Pomerantz to file claimant's brief on Plaintiff's behalf. Pomerantz failed to file any brief on Plaintiff's behalf, and missed the deadline. *See* copy of Dispute History—Briefs, attached hereto as **Exhibit "G"**.

32. On April 1, 2016, Plaintiff sent Pomerantz a letter releasing Pomerantz as Plaintiff's legal counsel. Copy of Notice of Release of Legal Counsel attached hereto as **Exhibit "H"**.

33. In this letter, Plaintiff explained that it had "become harder to communicate with [Pomerantz] resulting in [Plaintiff] feeling that [their] client and lawyer relationship has come to an end." **Exhibit H.**

34. Plaintiff engaged the legal services of John E. Steiner, Esquire, to take over representation of Plaintiff in regard to contesting the termination of Plaintiff's compensation benefits.

Steiner entered his appearance on Plaintiff's behalf on April 21, 2016. However, because Pomerantz had already let the record close, Plaintiff was unable to introduce further evidence supporting his claim.

35. Steiner referred Plaintiff to Dr. Frederick Lieberman, an orthopedic surgeon in Philadelphia. On April 27, 2016, Plaintiff had an initial evaluation with Dr. Lieberman, who recommended that Plaintiff obtain electrodiagnostic and imaging studies to ascertain the extent of the damage to his back.

36. On May 8, 2016, Plaintiff had an MRI of his lumbar spine performed at Advanced Diagnostics. This MRI revealed protrusions and herniations in Plaintiff's spine.

37. On May 10, 2016, Plaintiff underwent electrodiagnostic testing on his back. This testing revealed nerve damage in Plaintiff's back that was consistent with the timing of his work injury of October 22, 2014.

38. On May 18, 2016, Plaintiff had a follow-up evaluation with Dr. Lieberman. After examining, observing and speaking with Plaintiff, Dr. Lieberman's impression was that Plaintiff was "increasingly symptomatic with multiple herniated/protruding discs and a multilevel radiculopathy." Dr. Lieberman outlined a treatment plan of increasing Plaintiff's dosage of Neurontin, prescribing a muscle relaxant, and adding more pain medication. Dr. Lieberman also advised Plaintiff to get "an anesthesia consult regarding lumbar epidural corticosteroid injections." The report concludes: "He remains not fit for duty. He should continue with his course of therapy."

39. In March 2016, Plaintiff went to see a chiropractor, who noted both objective and subjective evidence of back pain in Plaintiff.

40. During the hearing to terminate Plaintiff's compensation benefits, Plaintiff was found to

have been terminated for cause and Plaintiff's compensation benefits were therefore suspended as of December 6, 2014.

41. Plaintiff was also found to have effectuated a full recovery from his employment injury, and his compensation benefits were therefore terminated as of June 3, 2015.

42. The judge's decision and order suspending and terminating Plaintiff's compensation benefits was dated October 22, 2016. This decision noted that Plaintiff had not admitted any medical evidence indicating that still required treatment for his employment injury. The decision also noted that Plaintiff had failed to contradict the employer's evidence that Plaintiff was terminated for cause.

43. Pomerantz knew or should have known that Plaintiff continued to require medical testing, treatment and rehabilitation for his injuries.

44. Upon information and belief, in the course of Pomerantz's representation of Plaintiff, Pomerantz failed to help Plaintiff obtain medical testing, treatment, or rehabilitation for his injuries.

45. In the course of Pomerantz's representation of Plaintiff, Pomerantz failed to introduce evidence of Plaintiff's continued medical treatment and rehabilitation for his injuries.

46. Pomerantz knew or should have known of evidence tending to contradict the employer's evidence that Plaintiff was terminated for cause.

47. In the course of Pomerantz's representation of Plaintiff, Pomerantz failed to introduce evidence indicating that Plaintiff was not terminated for cause.

48. Because Pomerantz failed to introduce evidence on Plaintiff's behalf, Plaintiff lost his worker's compensation benefits, both for lost wages and for medical treatment.

## COUNT I
## LEGAL MALPRACTICE/ SIMPLE NEGLIGENCE/ PROFESSIONAL NEGLIGENCE

49. Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

50. By entering into an attorney-client relationship with Plaintiff, Defendants undertook a duty of care towards Plaintiff.

51. As more fully set forth above, Defendants failed to render legal services to Plaintiff in accordance with the standard of care required of attorneys.

52. As a direct and proximate result of Defendants legal malpractice as aforesaid, Plaintiff was harmed and suffered significant damages, as well as other consequential and incidental damages.

53. Defendants knew or should have known that their actions and omissions aforesaid had an extremely high degree of probability of causing harm to Plaintiff.

54. Defendants acted in reckless indifference to the consequences of their actions and omissions aforesaid, meriting the imposition of punitive damages against them.

## COUNT II
## BREACH OF FIDUCIARY DUTY

55. Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

56. Plaintiff and Defendants had a fiduciary relationship.

57. Defendants breached their fiduciary duties owed to Plaintiff, as more fully set forth above, and also acted in violation of the Pennsylvania Rules of Professional Conduct.

58. As a direct and proximate result of Defendants' breach of fiduciary duty aforesaid, Plaintiff has been harmed and continues to be harmed, and has incurred significant damages, as well as other consequential damages.

59. Defendants knew or should have known their actions and omissions as aforesaid had an extremely high degree of probability of causing harm to Plaintiff.

60.  Defendants acted in reckless indifference to the consequences of their actions.

## COUNT III
## BREACH OF CONTRACT/COVENANT OF GOOD FAITH AND FAIR DEALING

61.  Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

62.  Plaintiff and Defendants entered into a contract for legal services.

63.  Defendants' aforementioned conduct constitutes a breach (express, implied, or as a matter of law) of that agreement to provide competent and effective legal services, as well as a breach of the covenant of good faith and fair dealing.

64.  As a direct and proximate cause of the aforesaid (incorporated by references), Plaintiff has been damaged (as set forth above).

**WHEREFORE**, Plaintiff demands judgment in his favor and against Defendants, for an amount in excess of $75,000.00, plus interest, costs of suit, punitive damages, plus other relief which this Honorable Court deems necessary and just, including injunctive relief.


Respectfully Submitted,


WEISBERG LAW

BY: _/s/ Matthew Weisberg_
MATTHEW B. WEISBERG, ESQ

DATED: _11-2-17_

SCHAFKOPF LAW, LLC

BY: _Gary Schafkopf_
GARY SCHAFKOPF, ESQ.

DATED: _1102-17_

# EXHIBIT A

ED Documents – Copy of Electronic Original

 **ARIA** HEALTH

**Aria Health Frankford**

4900 Frankford Avenue

Philadelphia, PA 19124

215-831-2000

## Discharge Instructions

**Patient:** HART, SHERMAN

01318923/14896690

**DOB:** 12/9/1982

**Date Printed:** 10/22/2014 5:01:57 AM

**Allergies:** shellfish   No Known Drug Allergies

We are pleased to have been able to provide you with Emergency Care here at ARIA Health. Please review these instructions again at home in detail as described to you in order to better understand your diagnosis and the necessary further treatment and precautions related to your condition.

This is the team who cared for you during your emergency room visit:

**ED Attending Physician:** Iovettz Tereshchenko, Nadia

You are being discharged today with diagnosis(s):

**Discharge Diagnosis:** Lumbar strain

**Follow Up Appointments:**

Additional Follow Up Info: worker's comp upon being discharged

No one deserves to be abused. If you need help, Please call 1-800-220-8116

If you need a family doctor or specialist in your neighborhood, call 1-(877)-808-ARIA or 1-(877)-808-2742

**Activity Restrictions:** Patient has no restrictions related to Driving, Stairs, Walking, Lifting, Sexual activity or Bathing.

**General Instructions:**

Take your discharge instructions and all of your medicines to your follow up appointment.

Please take all of your medicine as instructed.

Please return to the Emergency Department if you have any further concerns or problems.

**Procedures performed during your emergency visit:**

No procedures performed

**Immunization provided during your emergency visit:**

No immunizations provided

**Medications received during your emergency visit:**

No medications received

## Medication List

**Please continue to take these medications as prescribed and follow up with your Family Doctor. If you do not have a Physician please get a Primary Care Physician ASAP.**

albuterol  orally

**These are the NEW medications, equipment and studies the emergency room physician has prescribed.**

cyclobenzaprine 5 mg oral tablet  1 tab(s) orally 3 times a day as needed for muscle spasm

ketorolac 10 mg oral tablet  1 tab(s) orally 4 times a day, As Needed - as needed for pain

| Requested By: | | Printed From : Zone 2 |
|---|---|---|
| 10/22/14  05:01 | Tekwani, Rooplekha (Scribe) | Page 1 |



# EXHIBIT B

# pennsylvania
DEPARTMENT OF LABOR & INDUSTRY
BUREAU OF WORKERS' COMPENSATION

# NOTICE OF COMPENSATION PAYABLE

**DATE OF NOTICE**

1 2 - 0 4 - 2 0 1 4
MM     DD      YYYY

| EMPLOYEE SOCIAL SECURITY NUMBER OR WC ID NUMBER | DATE OF INJURY | WCAIS CLAIM NUMBER |
|---|---|---|
| 4 0 6 - 1 9 - 8 1 1 5 | 1 0 - 2 2 - 2 0 1 4 | |
| | MM   DD   YYYY | |

## EMPLOYEE

First name **Sherman**

Last name **Hart**

Date of birth **12/09/1982**

Address **PO Box 16591**

Address

City/Town **Philadelphia**   State **PA**   ZIP **19122**

County **Philadelphia**

Telephone **2156708603**

## INJURY INFORMATION

Part of body injured   **Lumbar**

Nature of injury   **Sprain/strain**

Accident/injury description narrative   **EE BENT DOWN TO PICK UP A CASE FOR THE PALLET THAT HE WAS BUILDING.**

Check if occupational disease ☐

## EMPLOYER

Name **The Coca-Cola Company**

Address **801 EAST ERIE AVENUE**

Address

City/Town **PHILADELPHIA**   State **PA**   ZIP **19134**

County **PHILADELPHIA**

Telephone **2154274500**   FEIN **230969220**

## INSURER or THIRD PARTY ADMINISTRATOR (if self-insured)

Name **Sedgwick CMS**

Address **P.O. Box 37726**

Address

City/Town **Philadelphia**   State **PA**   ZIP **19101**

County **Philadelphia**

Telephone **2152313900**   FEIN **362685608**

Contact **Kimberly Kucher**

NAIC code _____   or insurer code **2109**

Insurer/TPA claim # **30142951559-0001**

NOTICE TO EMPLOYER: This Notice should be clearly completed, (preferably typed) and filed with the Bureau. Filing with the Bureau by electronic batch upload in WCAIS, by electronically attaching the document to a claim in WCAIS, or by mail. A copy must be sent to the injured employee with the first payment of compensation.

NOTICE TO EMPLOYEE: If any questions arise regarding these payments, contact the representative named at the bottom of this Notice. If you cannot resolve a problem with the employer representative, you may call the Bureau at 800-482-2383.

Compensation is payable as follows:

☐ Check only if compensation for medical treatment (medical only, no loss of wages) will be paid subject to the Workers' Compensation Act.
Compensation for medical treatment is payable from date of injury.
For compensation for medical treatment only, you should not complete numbers 1 through 5.

1. Weekly compensation rate $ **6 4 2 . 1 3**   Based on an average weekly wage of $ **9 6 3 . 1 4**

2. Payments begin on **1 0 - 2 7 - 2 0 1 4**   (Compensation for loss of wages is payable for first 7 days only if disability extends
   MM   DD   YYYY   14 or more days; compensation for medical treatment is payable from the date of injury.)

3. Date first check mailed **1 2 - 0 3 - 2 0 1 4**   If the date exceeds the 21-Rule, check this box ☐ and explain on back of this form.
   MM   DD   YYYY

4. Payments will hereafter be made:   ☒ Weekly   ☐ Biweekly   ☐ Other (Specify):
   Any termination, suspension or modification of these payments must be made by agreement, final receipt, administrative or judicial determination, or as otherwise provided in the Workers' Compensation Act or Regulations of the Department.

(OVER)

LIBC-495 REV 09-13 (Page 1)

5. If injury involves loss under Section 306(c) (except for disfigurement of the head, face or neck) and employee has returned to work, complete the following information.

(a) Compensation is payable for _____ weeks . days for loss or loss of use of _____

(b) Employee returned to work without loss of income on _____
MM    DD    YYYY

(c) Healing period payable for _____ weeks _____ days (Up to (b) above and subject to 7-day waiting period)

(d) Total (a) and (c) payable _____ weeks _____ days.

(e) Credit taken for disability benefits paid $ _____

6. Remarks

Claims representative's name    (typed/printed)   Kimberly Kucher                    Telephone  2152313900

Claims representative's signature

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF LABOR & INDUSTRY
BUREAU OF WORKERS' COMPENSATION
1171 S. CAMERON STREET, ROOM 103
HARRISBURG, PA 17104-2501
(TOLL FREE) 800.482.2383

Any individual filing misleading or incomplete information knowingly and with the intent to defraud is in violation of Section 1102 of the Pennsylvania Workers' Compensation Act, 77 P.S. §1039.2, and may also be subject to criminal and civil penalties under 18 Pa. C.S.A. §4117 (relating to insurance fraud).

| Employer Information Services 717.772.3702 | Claims Information Services toll-free inside PA: 800.482.2383 local & outside PA: 717.772.4447 | Hearing Impaired toll-free inside PA TTY: 800.362.4228 local & outside PA TTY: 717.772.4991 | Email ra-li-bwc-helpline@pa.gov |



*Auxiliary aids and services are available upon request to individuals with disabilities.*
*Equal Opportunity Employer/Program*

LIBC-495 REV 09-13 (Page 2)

# EXHIBIT C

Case 2:17-cv-04994-GJP   Document 1   Filed 11/06/17   Page 21 of 118

Sherman Hart                                                    Hart vs. Philadelphia Coca-Cola
                              May 27, 2015

1    COMMONWEALTH OF PENNSYLVANIA

2    DEPARTMENT OF LABOR AND INDUSTRY

3    BUREAU OF WORKERS' COMPENSATION

4       OFFICE OF ADJUDICATION

5       BUREAU CLAIM NO. 7417594

6             - - - - - -

7    SHERMAN HART          :

8       - VS -             :

9    PHILADELPHIA COCA-COLA:          **ORIGINAL**

10            - - - - - -

11        Wednesday, May 27, 2015

12            - - - - - -

13

14        Oral deposition of SHERMAN

15   HART, held in the offices of Gerald Jay

16   Pomerantz, 21 South 12th Street, beginning

17   at 11:00 a.m., before Jen Szombathy, a

18   Certified Professional Reporter.

19

              - - - - - -

20        Brusilow & Associates

        Court Reporters & Videographers

21         255 South 17th Street

        Philadelphia, Pennsylvania 19103-6298

22           215.772.1717

              - - - - - -

23

24

Page 2

```
 1                    APPEARANCES
 2     GERALD JAY POMERANTZ
       BY:   GERALD JAY POMERANTZ, ESQUIRE
 3     Stephen Girard Building
       21 South 12th Street
 4     7th Floor
       Philadelphia, Pennsylvania 19107
 5     (215) 569-8866
       Counsel for the Plaintiff
 6
 7     ANTHONY J. BILOTTI & ASSOCIATES, LLC
       BY:   ELIZABETH G. GEE, ESQUIRE
 8     1400 N. Providence Road
       Suite 4035
 9     Media, Pennsylvania 19063
       (484) 444-4400
10     Counsel for the Defendant
11                    - - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Sherman Hart                                                    Hart vs. Philadelphia Coca-Cola
                                    May 27, 2015

Page 3

```
 1                    INDEX
 2    WITNESS: Sherman Hart
 3
                   EXAMINATION
 4
                             PAGE
 5
      By Ms. Gee                 6
 6
      By Mr. Pomerantz          39
 7
                     - - - - -
 8
 9                   EXHIBITS
10    NO.           DESC.           PAGE
      D. Hart-1   Corrective Action Form  25
11    D. Hart-2   Corrective Action Form  28
      D. Hart-3   Corrective Action Form  28
12    D. Hart-4   Corrective Action Form  28
      D. Hart-5   Corrective Action Form  28
13    D. Hart-5A  Corrective Action Form  28
      D. Hart-6   Corrective Action Form  34
14    D. Hart-7   Corrective Action Form  34
      D. Hart-8   Corrective Action Form  34
15
16
17
                     - - - - -
18
19
20
21
22
23
24
```

Page 4

1          - - - - - -

2

3          REQUEST  FOR  DOCUMENTS/ITEMS

4                    PAGE          LINE

5

6

7

8       QUESTIONS  INSTRUCTED  NOT  TO  ANSWER

9                    PAGE          LINE

10

11

12

13

14          - - - - - -

15

16

17

18

19

20

21

22

23

24

Page 5

```
 1                    -   -   -

 2                 PROCEEDINGS

 3                    -   -   -

 4            (It is stipulated by and

 5       between counsel for the respective

 6       parties that sealing, filing and

 7       certification are waived and that all

 8       objections, except as to the form of

 9       the question, are reserved until the

10       time of trial.)

11                    -   -   -

12            SHERMAN HART, after having

13       been first duly sworn, was examined

14       and testified as follows:

15                    -   -   -

16                 EXAMINATION

17                    -   -   -

18            MS. GEE:  We're here in the

19       matter of Sherman Hart versus

20       Coca-Cola.  We're here at the offices

21       of Gerald Jay Pomerantz to take the

22       trial deposition of Mr. Hart in lieu

23       of his live testimony before a

24       workers' compensation judge.  My name
```

Page 6

1      is Elizabeth Gee.  I'm present on

2      behalf of Coca-Cola.  Attorney

3      Pomerantz is present for the claimant.

4      Because this is a trial deposition,

5      all objections must be stated on the

6      record and all reasons for objections

7      must be stated on the record as well.

8      The objection must be properly

9      preserved in writing in accordance

10     with the special rules or it will be

11     deemed waived.

12              Is that all agreeable to you?

13              MR. POMERANTZ:  Read and sign.

14   BY MS. GEE:

15        Q.    Will you please state your name for

16   the record.

17        A.    Sherman Hart.

18        Q.    What is your current address?

19        A.    1513 Adams Avenue.

20        Q.    Is that in Philadelphia?

21        A.    Yes.

22        Q.    How old are you?

23        A.    32.

24        Q.    With whom do you live?

Sherman Hart

Hart vs. Philadelphia Coca-Cola

May 27, 2015

Page 7

```
 1        A.    My cousin.
 2        Q.    And how old is your cousin?
 3        A.    33 I think.
 4        Q.    Do you have any children?
 5        A.    Yes.
 6        Q.    How old are they or he or she?
 7        A.    One and six.
 8        Q.    Who is your primary care physician
 9  or your family doctor?
10        A.    The family doctor I have is in my
11  hometown Louisville, Kentucky.  Here I don't
12  really have a doctor.  Every now and then I
13  would see -- his name is -- it starts with a P.
14  I forget how to pronounce it.
15        Q.    Do you know where that doctor is
16  located?
17        A.    He is on Lehigh and Front.
18        Q.    Is that an Aria Hospital?
19        A.    No, it's private practice.
20        Q.    What pharmacy do you typically use
21  to fill your prescriptions, if you have any?
22        A.    No.
23        Q.    Did you ever injure your lower back
24  prior to October 22, 2014?
```

Page 8

1       A.      I was in a car accident before and

2   I hurt my back.

3       Q.      When was that car accident?

4       A.      I want to say January, February

5   2012.

6       Q.      What injury did you sustain in that

7   car accident?

8       A.      It was a back spasm.

9       Q.      Lower back?

10      A.      Yes.

11      Q.      Anywhere else?

12      A.      My knee.

13      Q.      Which knee?

14      A.      Right knee.  Didn't sustain a

15  serious injury.

16      Q.      Did you treat with any doctors or

17  go to a hospital after that?

18      A.      Yes, I went to a hospital and I had

19  chiropractic care.

20      Q.      What hospital did you go to?

21      A.      Aria Frankford I believe.

22      Q.      Do you remember the name of the

23  chiropractor that you saw?

24      A.      It was on Frankford, too.  I can't

Page 9

1    remember the name.

2          Q.    How long did you see that

3    chiropractor?

4          A.    Around six months maybe.

5          Q.    When did that treatment end?

6          A.    It ended probably around maybe May,

7    June maybe.

8          Q.    Of 2013?

9          A.    '12.

10          Q.    Did you get any diagnostic studies,

11    meaning x-rays, MRI, CAT scans following that

12    car accident?

13          A.    I think I got a scan.  I don't

14    remember what treatment.

15          Q.    Is that at the hospital?

16          A.    Yes.

17          Q.    Were you prescribed any medication

18    in relationship to that car accident?

19          A.    Yes.

20          Q.    What were you prescribed?

21          A.    I think it was called Oxycodone or

22    something and another painkiller medicine.

23          Q.    Are you still taking those from

24    that car accident?

Page 10

```
1        A.    No.

2        Q.    You were hired by Coca-Cola August

3   14, 2012.

4              Does that sound right?

5        A.    Yes.

6        Q.    What were you hired as?

7        A.    Laborer.

8        Q.    Can you describe some of your job

9   duties?

10       A.    Order building, lifting sodas,

11   driving the forklift.

12       Q.    You're mostly in the warehouse?

13       A.    Yes, all warehouse.

14       Q.    How far did you go in school?

15       A.    Bachelor's degree.

16       Q.    What is your bachelor's in?

17       A.    Film and media arts.

18       Q.    Where did you go to college?

19       A.    Temple.

20       Q.    And you got that degree already?

21   You finished?

22       A.    Yes.

23       Q.    When did you graduate?

24       A.    May 2012.
```

Sherman Hart                                May 27, 2015

1       Q.      Prior to working at Coca-Cola,
2  where did you work?
3       A.      I worked for another factory in
4  Louisville, Kentucky.
5       Q.      Was that another warehouse job?
6       A.      Yes.
7       Q.      How long did you work there?
8       A.      Off and on for probably since -- I
9  want to say 2004.
10      Q.      2004.  And when did you stop that
11 job?
12      A.      I would say 2010 was the last time
13 I worked there.
14      Q.      Is that because you came to Philly
15 for school?
16      A.      Yes.  I go back often to Louisville
17 so I would work any time I was in Louisville.
18      Q.      Now, prior to October 22, 2014, had
19 you ever had any workers' compensation claims
20 before?
21      A.      No.
22      Q.      Now, besides the car accident that
23 we previously talked about, have you ever had
24 any other diagnostic studies for anything else?

Page 12

1          A.     No.

2          Q.     That work accident, you were

3    involved in a personal injury claim; is that

4    correct?

5          A.     Yes.

6          Q.     That's completed?  That's finished,

7    right?

8          A.     What's finished?

9          Q.     That lawsuit you had been involved

10   in.

11         A.     What lawsuit?

12         Q.     Were you involved in a lawsuit

13   related to that car accident?

14         A.     Yes, I guess it was a lawsuit, yes.

15              MR. POMERANTZ:  Objection to

16        the form of the question.  I don't

17        believe a suit was filed.

18              THE WITNESS:  I was the

19        passenger in the car and I guess they

20        had a lawyer and they referred me to

21        that lawyer, but the chiropractor I

22        was seeing, so I guess it was a

23        lawsuit.

24   BY MS. GEE:

Sherman Hart                                                     Hart vs. Philadelphia Coca-Cola

May 27, 2015

Page 13

1          Q.     You're not doing anything related

2     to that anymore?

3          A.     No.

4          Q.     Had you had any other accidents or

5     slips and falls prior to the work injury?

6          A.     No.

7          Q.     Besides the car accident we talked

8     about, have you ever treated for your low back

9     on any other occasion?

10         A.     No.

11         Q.     Now, while working for Coca-Cola

12    you took FMLA leave?

13         A.     Yes.

14         Q.     And you took various periods of

15    intermittent leave, right?

16         A.     Yes, when my son was born.

17         Q.     That was for your son being born?

18         A.     Yes.

19         Q.     Did you take FMLA for anything else

20    other than your son being born?

21         A.     I have asthma so I had leaves on

22    asthma days.

23         Q.     You were approved for intermittent

24    FMLA for the period of October 13, 2014 through

May 27, 2015

Page 14

```
 1      April 12, 2015; is that right?
 2      A.     Yes.
 3      Q.     Was that for asthma?
 4      A.     Yes.
 5      Q.     What doctor filled out that
 6   paperwork for you?
 7      A.     The same doctor on Lehigh.
 8      Q.     And you think his name starts with
 9   a P?
10      A.     Yes.  I can't pronounce it.  I
11   forget.
12      Q.     How often would you have to go out
13   of work for your asthma?
14      A.     Per week, per month?
15      Q.     Maybe once a week, once a month?
16      A.     Maybe two, three times a month.
17      Q.     Did you ever have to miss work for
18   the car accident?
19      A.     No, that was before I started.
20      Q.     I'm going to turn your attention to
21   October 22, 2014.
22             You were injured at work, correct?
23      A.     Yes.
24      Q.     Can you tell me what happened.
```

```
 1          A.    Yes, I was doing the normal lifting

 2    of my soda cases.  As I was picking up a case of

 3    soda to put on the pallet, my foot was caught in

 4    the plastic.  And as I was turning to put the

 5    soda on the pallet, I twisted my back and the

 6    case and my foot got caught in the plastic.

 7          Q.    Did you go to the hospital after

 8    that?

 9          A.    Yes.

10          Q.    Did you go immediately?

11          A.    Yes.

12          Q.    You went to Aria, right?

13          A.    Yes.

14          Q.    Now, what did they do for you at

15    Aria?

16          A.    They gave me some medication and

17    she checked my back, said I had some spasms.

18          Q.    Now, did they take any x-rays or

19    MRIs?

20          A.    Not that I remember, no.

21          Q.    Did you return to work after you

22    were seen at Aria?

23          A.    I brought my paperwork back to the

24    job, then I went home.
```

Page 16

1     Q.    Were you seen by a doctor at

2  Coca-Cola's facility?

3     A.    Like a month later, yes.  I seen

4  the nurse that was there on vacation probably

5  the next following week, like five days later.

6     Q.    When you went to the work doctor or

7  nurse, what did they do for you?

8     A.    They gave me some medication and

9  she set me up with the chiropractor up the

10  street from the job.

11     Q.    And what was the name of that

12  chiropractor?

13     A.    I'm not sure of the name.  I think

14  I have it in the paperwork.  Do you have the

15  paper with the name on it?  NovaCare, that's it

16  on the next one.

17     Q.    Now, when you first saw the work

18  doctor, you were released to modified duty work,

19  correct?

20     A.    Yes.

21        MR. POMERANTZ:  Objection to

22      the form of the question.

23        MS. GEE:  This is cross.

24  BY MS. GEE:

Sherman Hart                                           Hart vs. Philadelphia Coca-Cola
                          May 27, 2015

                                                                    Page 17

1      Q.     Did you immediately go back to

2   work?

3      A.     I went to light duty modified.

4      Q.     When did you start work again?

5      A.     I believe the next day I went to

6   work at 6 p.m., that shift, then I had off two

7   days, then I went back that Monday.  That's when

8   I spoke with the nurse.

9      Q.     So you did continue working in a

10  modified capacity?

11     A.     Yes.

12     Q.     You were able to do that?

13     A.     Yes.

14     Q.     And did you periodically follow up

15  with the work doctor?

16     A.     With the nurse.  I only seen the

17  doctor one time.

18     Q.     And they sent you to physical

19  therapy?

20     A.     Yes.

21     Q.     And you did go to that physical

22  therapy?

23     A.     Yes.

24     Q.     How often did you go?

Page 18

1      A.      Three times a week, sometimes four.

2      Q.      For how long?

3      A.      All the way up until late December.

4  I don't know the date.  Until I didn't get a new

5  prescription for it.

6      Q.      Now, you were supposed to go back

7  to that facility on December 17, 2014, correct?

8      A.      To what facility?

9      Q.      To the work doctor or work nurse.

10      A.      Yes.

11      Q.      You did not go to that appointment?

12      A.      She wasn't there.  I called to

13  reschedule and I couldn't get a hold of her.

14  And at that time I couldn't get in the building

15  because I got fired.

16      Q.      At any point were you working full

17  duty after the work injury?

18      A.      No.

19      Q.      Have you treated with any other

20  doctors besides the ones we've talked about for

21  this injury?

22      A.      I seen a chiropractor in my city

23  when I was there.  A family friend chiropractor

24  that showed me some exercises I could do to help

1    me since I'm unable to get a hold of their

2    chiropractor anymore.

3         Q.    That was in Kentucky?

4         A.    Yes.

5         Q.    What is the name of that?

6         A.    I wouldn't know the name of the

7    facility.

8         Q.    Do you know the name of the

9    chiropractor?

10        A.    I forget his name.  I can probably

11   get it.  It was from a family friend.  He did it

12   off the record for me.

13        Q.    He showed you some exercises?

14        A.    Yes.

15        Q.    Are you still going back to this

16   person or do you plan on seeing this person

17   again?

18        A.    No.  At that time I was supposed to

19   have a vacation coming up already with the job

20   so I went down anyway.  I already had a flight

21   to go there.  When I was there since I was cut

22   off from here, I was trying to get some work

23   when I was there because my back was still

24   hurting.

Page 20

1      Q.    Has your attorney referred you to

2  any doctors?

3      A.    No.

4      Q.    Are you currently treating for low

5  back?

6      A.    No, I couldn't get set up with any

7  treatment.  I kept calling the nurse and the

8  workmen's comp people.

9      Q.    What are your current symptoms that

10  you relate to the work injury?

11      A.    My lower back and I feel numbness

12  and sharp pain in my quad and going down my leg

13  and my calf.

14      Q.    Is it just one leg or both?

15      A.    Mainly the right leg.  Every now

16  and then the left, but mainly the right leg

17  quad.

18      Q.    Now, you stated you were terminated

19  from Coke, correct?

20      A.    Yes.

21      Q.    Are you currently working?

22      A.    No.

23      Q.    Have you looked for work at all

24  since being terminated?

Page 21

1      A.     Yes.

2      Q.     Where have you looked?

3      A.     Numerous places.

4      Q.     Can you give a few examples?

5      A.     A couple of film terms in my major.

6   When I was first fired I looked at -- I forget

7   the name.  It was through a temporary company.

8   I applied with those.  And then I went to a

9   couple of job fairs that Temple held.

10      Q.     You do feel like you're able to

11   work?

12      A.     Not the same capacity I worked like

13   Coke.  I'm looking for something I can sit down

14   and something in my major.  I'm unable to do

15   that physical all the time.

16      Q.     Have you received any income or

17   wages since the date of injury besides your

18   wages that you earned when you returned to work

19   from any other sources?

20      A.     No.

21            MR. POMERANTZ:  Does that

22      include unemployment?

23            MS. GEE:  I'll break it down.

24      I'll ask that now.

Page 22

1    BY MS. GEE:

2        Q.    Have you received unemployment

3    compensation?

4        A.    Yes.

5        Q.    And what period of time did you

6    receive that?

7        A.    Three months now.

8        Q.    Are you still receiving it?

9        A.    Yes.

10        Q.    How much are you receiving?

11        A.    I think 500.

12        Q.    Per week?

13        A.    Yes.  It's biweekly.  I think it's

14    500 a week.

15        Q.    Describe what you do on a

16    day-to-day basis.

17        A.    Day-to-day basis I try to do some

18    film editing every now and then, help my son

19    with his homework after school.  Look for work

20    online.  Usually in the house more now.

21        Q.    Do you have any e-mails or anything

22    like that that kind of confirm any job

23    applications that you've sent?

24        A.    I have online where I go to the web

Page 23

```
 1   site for unemployment.
 2          Q.     If you have any verifications,
 3   would you mind sending those to your attorney?
 4                 MR. POMERANTZ:  I asked him
 5          for them and he will send them and
 6          I'll provide them.
 7                 MS. GEE:  Thank you.
 8   BY MS. GEE:
 9          Q.     Are you able to drive?
10          A.     Yes.
11          Q.     Are you able to do the cooking and
12   cleaning around the house?
13          A.     No.
14          Q.     You don't or you can't?
15          A.     I try to limit certain cleaning.  I
16   can't really lift.
17          Q.     How about laundry?
18          A.     No, I don't do that.
19          Q.     Do you have any hobbies?
20          A.     No.
21          Q.     Do you participate in any sports or
22   go to the gym at all?
23          A.     I used to.
24                 MR. POMERANTZ:  Now or
```

Page 24

1    previously?

2                MS. GEE:  Now.

3                THE WITNESS:  Not able to.   I

4    used to go to the gym like three, four

5    times a week.  I had to cancel my

6    membership.

7    BY MS. GEE:

8        Q.    Is that because of the work injury?

9        A.    Yes.

10       Q.    Now, you were subject to corrective

11   actions for certain violations of policy while

12   employed at Coke, correct?

13       A.    Yes.

14       Q.    And how that would work you would

15   receive a couple verbal warnings, then you would

16   get written warnings and progressively you had a

17   certain number of shots, shall I say?

18               MR. POMERANTZ:  Objection to

19       form.  You can answer.

20               THE WITNESS:  I would say yes.

21   BY MS. GEE:

22       Q.    You received several warnings for

23   taking excessive breaks and not notifying your

24   supervisors that you were leaving to take

Page 25

1    breaks, correct?

2         A.    No.   Say that again, they gave me

3    excessive what?

4         Q.    Excessive breaks or unscheduled

5    breaks.  Did you receive corrective actions for

6    those?

7         A.    Yes, we have breaks when the system

8    goes down.  We're supposed to break out on our

9    headsets.  So I wouldn't agree it's excessive.

10   That's out of my control.

11        Q.    And you received some corrective

12   actions for swiping under incorrect codes or

13   codes you weren't assigned?

14        A.    One supervisor I wasn't working

15   with could say that, but my supervisor I work

16   with tells me to swipe under certain functions.

17        Q.    Even if you don't agree with the

18   violations, they were documented, correct?

19        A.    Yes, I guess.

20             MS. GEE:  I'm going to show

21   you what I'll have marked as D.

22   Hart-1.

23             (Exhibit D. Hart-1 is marked

24   for identification.)

Page 26

1    BY MS. GEE:

2         Q.    Could you take a look at that,

3    please.

4         A.    How is that excessive?  It's 12

5    hours.

6              MR. POMERANTZ:  I read it.

7         And I believe there's a question on

8         the table.

9    BY MS. GEE:

10        Q.    Do you remember getting these

11   various written reprimands that are documented

12   on this?

13              MR. POMERANTZ:  Objection to

14        the form of the question.  It's one

15        bargaining unit corrective action

16        form.

17              MS. GEE:  I can give you all

18        of them.

19              MR. POMERANTZ:  If there are

20        multiples, we'd like to see them so we

21        can answer the question.

22              MS. GEE:  Sure.

23              MR. POMERANTZ:  Can we have

24        these marked in sequential order

Page 27

```
 1              dates, then we can go through them.
 2                      MS. GEE:  The first one I have
 3              is dated 6/16/2014.  We'll remark that
 4              previous exhibit.
 5                      MR. POMERANTZ:  First written
 6              reprimand, is that the one?
 7                      MS. GEE:  I have 6/16 as the
 8              discussion counseling coaching.
 9                      MR. POMERANTZ:  There is no
10              case number.  There's a check mark in
11              discussion counseling coaching.
12                      MS. GEE:  We'll do that as D.
13              Hart-1.  As D. Hart-2 I have where
14              it's checked off written record of
15              verbal warning 9/28/2014.
16                      MR. POMERANTZ:  What I have
17              marked as D. Hart-1 says written
18              reprimand 10/5.  Do I have the right
19              one?
20                      MS. GEE:  There's one before
21              that.
22                      MR. POMERANTZ:  Why don't we
23              go off the record.
24                      (Discussion off the record.)
```

Page 28

1              (Exhibits D. Hart-2 through D.

2         Hart-5A are marked for

3         identification.)

4    BY MS. GEE:

5         Q.    Now, Mr. Hart, you received on June

6    16, 2014 a, I guess they call it discussion

7    counseling coaching corrective action form for

8    failure to follow procedure and policy, correct?

9         A.    Yes.

10        Q.    Now, if you take a look at the

11   second page.  It says, refused to sign.

12             Did you write that or did somebody

13   write that on your behalf?

14        A.    Someone wrote that.

15        Q.    Were you present?

16        A.    Yes.

17             MR. POMERANTZ:  Objection to

18        the form.  Present for what, when it

19        was signed?

20             MS. GEE:  Present when it was

21        signed.

22             THE WITNESS:  It was already

23        signed before I came in usually.  I

24        was present when they told me I had

Sherman Hart

Hart vs. Philadelphia Coca-Cola

May 27, 2015

Page 29

```
 1        the write up.
 2   BY MS. GEE:
 3        Q.    If you take a look at D. Hart-2.
 4   This states you received a written record of
 5   verbal warning on 9/28/2014, correct?
 6        A.    Yes.
 7        Q.    And the same thing on page 2 it
 8   says, refused to sign.
 9             Were you present when this -- you
10   did receive this form, correct?
11        A.    Yes, I wasn't present when they
12   signed, but I received the paperwork, yes.
13        Q.    And someone wrote refused to sign
14   on your behalf?
15        A.    Yes.
16        Q.    D. Hart-3, you received your first
17   written reprimand for improper procedure and
18   policy, correct?
19        A.    Yes.
20        Q.    And then you received this
21   paperwork, correct?
22        A.    Yes.
23        Q.    And again refused to sign.
24   Somebody wrote that for you?
```

Page 30

1       A.      Yes.

2       Q.      We'll look at D. Hart-4, it

3    indicates a second written reprimand on October

4    7, 2014, correct?

5       A.      You said second for --

6               MR. POMERANTZ:  If that's what

7       it says.  She's asking you is that

8       what it says here.

9               THE WITNESS:  Yes.

10   BY MS. GEE:

11      Q.      Now, on page 2 of that document it

12   indicates that you were warned that future

13   infractions would result in progressive

14   disciplinary action, including termination,

15   correct?

16              MR. POMERANTZ:  Where is that?

17              MS. GEE:  It's going to be in

18      the second box.

19              MR. POMERANTZ:  Okay.

20   BY MS. GEE:

21      Q.      Did you receive that information or

22   warning?

23      A.      I'm trying to remember this.  I

24   don't even remember seeing this.  No, I don't

Page 31

```
 1    remember this one.  I might have received this

 2    one.  I can't remember this one though.  I

 3    probably received it.

 4         Q.    I'll ask you to look at D. Hart-5.

 5    It indicates a third written warning received on

 6    October 22, 2014, correct?

 7         A.    Yes.

 8         Q.    That is the day of the work injury,

 9    correct?

10         A.    Yes, the injury day.

11         Q.    And did you receive this before or

12    after you were injured at work?

13         A.    That's what I'm saying.  They

14    pre-sign and write it.  I don't remember if I

15    got this before.

16              MR. POMERANTZ:  Wait a second.

17         This is different than what I have

18         marked as D-5.

19              THE WITNESS:  They are saying

20         two different things.

21              MR. POMERANTZ:  One says third

22         and one says second and third.  What I

23         have on the record is --

24              THE WITNESS:  They have the
```

Page 32

1      same dates with different writing.

2              MR. POMERANTZ:  Obviously I

3      object.  I object to generally all of

4      these having --

5              THE WITNESS:  I'm called in

6      the office almost every day.

7      Sometimes they do paperwork.

8              MR. POMERANTZ:  They both say

9      October 22nd refused to sign 2014.

10     I'm going to call the one I had

11     previously marked as D. Hart-5, then

12     the next one should be D. Hart-5A.

13     What has been referred to by counsel

14     as D. Hart-5 is now marked as D.

15     Hart-5A.  She hasn't asked you your

16     explanation yet.  I think the question

17     is, did you receive it?

18             THE WITNESS:  Yes.

19             MR. POMERANTZ:  You received

20     both of them?

21             THE WITNESS:  I received one I

22     remember.  I don't remember getting

23     two with different writing.  I don't

24     know which one I got.

Sherman Hart

Hart vs. Philadelphia Coca-Cola

May 27, 2015

Page 33

```
1    BY MS. GEE:
2         Q.    Did you receive a corrective action
3    on October 22, 2014?
4         A.    Yes.
5         Q.    You do recall that, okay.
6              MR. POMERANTZ:  I don't have
7    D. Hart-5 now because mine was used.
8              MS. GEE:  It's in your packet
9    of records.
10             MR. POMERANTZ:  What I have
11   marked as D. Hart-5 is marked D.
12   Hart-5A.  I had previously marked it
13   pursuant to your question.  So I can
14   make a copy of it.  I prefer to have a
15   copy now.  So let's go off the record
16   for a moment and I'll have a copy
17   made.
18             (Discussion off the record.)
19   BY MS. GEE:
20        Q.    Now, in addition to these various
21   corrective action forms that we discussed --
22             MR. POMERANTZ:  Objection to
23   the form of the question.
24   BY MS. GEE:
```

Page 34

1        Q.    -- you also received corrective

2    actions for violating a cell phone policy; is

3    that right?

4        A.    I received one.

5             MS. GEE:  I'm going to hand

6        you another set of documents.  We'll

7        mark this first one as D. Hart-6.

8             (Exhibits D. Hart-6 through D.

9        Hart-8 are marked for identification.)

10   BY MS. GEE:

11       Q.    Now, D. Hart-6 that you have in

12   front of you, that's a corrective action form,

13   correct?

14       A.    Yes.

15       Q.    This form indicates that on January

16   6, 2014 you received a first written reprimand

17   for using your cell phone while working on that

18   date?

19            MR. POMERANTZ:  The document

20       speaks for itself.  There's no

21       objection.

22            THE WITNESS:  Yes, I was on

23       break though.

24   BY MS. GEE:

1        Q.      Now, on page 2 somebody wrote

2    Sherman chose not to sign, correct?   Looks like

3    John Lynn.

4        A.      Yes.

5        Q.      Now, if you turn back to the first

6    page it says on break at the time.

7                Is that something you wrote?

8        A.      Yes.

9        Q.      So you did receive this?

10        A.      Yes.

11        Q.      Now, turning your attention to D.

12    Hart-7.   This indicates you received a second

13    written reprimand for the cell phone policy

14    again, violation of the cell phone policy on

15    October 6, 2014, correct?

16        A.      No, I didn't receive this.

17        Q.      You did not receive this?

18        A.      No.

19        Q.      Even though it says refused to

20    sign?

21        A.      Yes.

22        Q.      Turning your attention to D.

23    Hart-8.   This form indicates you received a

24    third written reprimand on November 6, 2014,

Page 36

```
 1    correct?

 2         A.    Yes.

 3         Q.    This indicates you had your cell

 4    phone on the floor at work, correct?

 5         A.    No.

 6         Q.    It does not indicate that?

 7              MR. POMERANTZ:  She's not

 8         asking you whether or not you agree

 9         with it.  She's asking you if that's

10         what it says.  Read what it says.

11              THE WITNESS:  Yes.

12    BY MS. GEE:

13         Q.    Now, had you been aware that you

14    were not permitted to have your cell phone on

15    the floor of the warehouse?

16              MR. POMERANTZ:  Objection to

17         the form of the question.

18              THE WITNESS:  I was aware the

19         employee told the supervisor it's his

20         phone.  And he seen I didn't have my

21         phone.  When he asked to see my phone,

22         which was in my locker, I went to my

23         locker and showed him my phone, which

24         was red at the time.  I asked him what
```

1          color was my phone if you seen the

2          phone.  He was behind us.  He just

3          said I seen a light.  Then when I said

4          what color is my phone.  He said I

5          guess white.  Then when I went to get

6          my phone out of the locker, then he

7          seen it was red, then he switched the

8          story.  First he said he seen the cell

9          phone, then he said he saw the light.

10         The employee is telling you it's his

11         phone.  Then when I went to my locker,

12         his employee tells me he said, why are

13         you going to help him out, why are you

14         trying to help him.

15    BY MS. GEE:

16         Q.    Did you receive this corrective

17    action for a violation?

18         A.    Yes, I received this.

19         Q.    And this indicates on page 2 that

20    future infractions could result in progressive

21    disciplinary action including termination,

22    correct?

23         A.    Yes.

24              MR. POMERANTZ:  It says

Page 38

1     November 6th, not October 6th.  It had

2     been changed.  I pointed out so we can

3     clarify.

4  BY MS. GEE:

5        Q.    After that third corrective action

6  dated November 6, 2014 you were terminated from

7  employment, correct?

8              MR. POMERANTZ:  Objection to

9        the form of the question.

10             THE WITNESS:  Can you repeat

11       it again?

12  BY MS. GEE:

13       Q.    Were you terminated after receiving

14  this third corrective action?

15       A.    Yes, in December.

16       Q.    That was December 5, 2014?

17       A.    Yes.

18       Q.    And you filed a grievance for this

19  corrective action?

20       A.    Yes.

21       Q.    And that was denied, correct?

22       A.    I guess it was.  I didn't hear

23  nothing back from it.  We just talked about it

24  and next thing I know I was fired.  I didn't

1    hear nothing about the grievance.

2         Q.    Did you go in for a hearing or a

3    meeting?

4         A.    Yes, I went in for a hearing.  I

5    never heard nothing based on it until the day

6    they said I was fired for it.

7              MS. GEE:  I have no further

8         questions.  And I would attach D.

9         Hart-1 through D. Hart-8 to the

10        transcript.

11             MR. POMERANTZ:  I have some

12        questions.

13   BY MR. POMERANTZ:

14        Q.    Let's go to D. Hart-1.  Mr. Hart,

15   could you explain why you refused to sign this?

16        A.    I refused to sign --

17        Q.    And is that your signature?

18        A.    No, none of this is my signature.

19        Q.    Can you explain with regard to D.

20   Hart-1 the reason for refusing to sign?  Take

21   your time and read it over.  It says, Sherman is

22   receiving a coaching for failure to follow

23   procedures and policies on June 15th.  Sherman

24   was out of his work area and was in the

Page 40

1   cafeteria at 9:15 p.m. without notifying a

2   supervisor that he was leaving his work area.

3   This was outside of any scheduled breaks or

4   lunch.  Any further violations of this procedure

5   and policy will result in further progressive

6   disciplinary actions.  Can you explain why you

7   refused to sign?

8        A.    Because I didn't agree with it.

9        Q.    Why didn't you agree with it?

10        A.    From my memory, I can remember I

11   believe this is when I went on break late.  I

12   would get called in the office a lot during the

13   week.  Some days they give written and some days

14   they don't.

15        Q.    Give written what?

16        A.    Written forms of these, corrective

17   actions.  A lot times they don't give corrective

18   actions.  They call you in there and talk to you

19   about the situation.  So from this from my

20   knowledge of recalling on this date, I was in

21   the cafeteria, it's either a time I was on break

22   late or either I was in there getting a

23   Band-Aid.  One time I remember I had to get some

24   first aid.  And I told one supervisor but I

Sherman Hart                                        Hart vs. Philadelphia Coca-Cola
                        May 27, 2015

                                                                Page 41

```
 1   didn't tell the other supervisor.  So I'm like
 2   if I told one, why do I need to tell two.  I'm
 3   not sure if this is this one or the other one.
 4   It's been numerous times when you're called in
 5   the office.
 6        Q.    When you say you went on break
 7   late, can you explain that for the record.
 8        A.    Sometimes we have in the middle of
 9   work and at the point of this time it's no bell
10   or no indication when it's break.  The fact
11   you're not supposed to have a phone, you have to
12   guess.  If I'm in the middle of a work order, I
13   don't know the time until I finish the work
14   order.
15        Q.    When that occurs, what do you do
16   when it occurs and if you finish a work order
17   and it was already break time?
18        A.    I usually go to break.  That's what
19   I do every day.  Numerous employees, we all do.
20   Some people go at this time, some go at that
21   time, some go early.
22        Q.    Had that been discussed with
23   supervisors as to what you do when you're in the
24   middle of a loading job and it's break time?
```

Page 42

1    A.    At one point they said that's why

2 they initiated having a bell ring.  That went on

3 for a while, then they stopped the bell ringing.

4 It's a variation of time.  There's no clear code

5 of when you're supposed to have the break if the

6 bell is not ringing all the time.

7    Q.    Is there any kind of discussion

8 with respect to what you're entitled to if you

9 complete the loading job that you're working on?

10    A.    No.

11    Q.    Are you supposed to complete the

12 job if you're in the middle of a loading?

13    A.    That's nothing that's written in

14 stone, whether we should or we shouldn't.  Some

15 supervisors say go to break and leave the pallet

16 undone and some don't say anything about you

17 going.  Then you have some when -- I say maybe

18 one day they might enforce and say everybody go

19 to break on time, forget the pallet, leave it.

20 Then when we start getting real busy, it's like

21 finish the pallet and then go.  It's like an

22 unwritten rule.

23    Q.    Were you ever told on occasion to

24 finish the pallet and then take your break?

1          A.     Yes.

2          Q.     When you were told that, were you

3    told that you were entitled to a full break

4    time?

5          A.     Yes.

6          Q.     And is that one of the reasons why

7    you refused to sign that you were in violation?

8          A.     Yes, because it's no definitive

9    answer for that.  Sometimes it's okay.

10   Sometimes it's not.  They didn't enforce this on

11   us.  I'm just working and finishing the pallet

12   on time.  If it's okay when it's summertime and

13   it's fast, when it's slow it's not okay, so.

14         Q.     That was for D. Hart-1.  D. Hart-2

15   says, Sherman is receiving a written record of

16   verbal warning for failure to follow procedure

17   and policy on September 28th.  That was three

18   months after.  Sherman was out of his work area

19   and in the cafeteria at 7:45 without notifying a

20   supervisor that he was leaving his work area.

21   He also improperly swiped under battery change

22   for more than 10 minutes.  This was outside of

23   any scheduled breaks or lunch.  Any further

24   violations of this procedure and policy will

Page 44

1    result in further progressive disciplinary

2    action.

3                You refused to sign for that?

4        A.    Yes.

5        Q.    Do you remember this violation?

6        A.    Yes.

7        Q.    Can you explain why you refused to

8    sign?

9        A.    Yes, I refused to sign because

10   numerous occasions I had complained that my jack

11   wasn't working and the battery was dying.

12       Q.    Is that on this particular date?

13       A.    Yes, that date as well.  But

14   previous before and they kept saying we're going

15   to talk to maintenance.  And I write up every

16   day my battery is dying too fast, my machine is

17   not working, what can I do.  One supervisor said

18   go under battery change, go charge it until it

19   gets charged full and come back.  In the

20   meantime I'm looking for a new jack but we have

21   not enough equipment and more people than

22   equipment.  So when mine breaks if it's a day

23   where everybody is at work and no miss, I don't

24   have a jack to get.  So he was like charge it up

1    and wait was what was told to me.  And I had to

2    go over this for two months my jack was messed

3    up until I finally got a new one.

4          Q.    Was that during the time period of

5    this written record of verbal warning referred

6    to as Hart-2?

7          A.    Yes.

8          Q.    And the battery change was for more

9    than ten minutes here?

10         A.    I'm not sure.  I wasn't counting

11   the time.  I was waiting for my full charge

12   light to come on.

13         Q.    The reason why you refused to sign,

14   did you relate that to the shop steward?

15         A.    I told the supervisor that I was

16   working with.

17         Q.    It says shop steward was present on

18   page 2?

19         A.    Yes, the shop steward was there.

20   He's the one that signed the paperwork.  So when

21   they called me in to ask, I think this was -- I

22   don't even know if this was the same day.  They

23   gave me this.  It has the date on it, but they

24   gave me the write up the next day.  That's when

Page 46

1    we went in the office and the shop steward

2    signed.

3         Q.    Did you explain on that day the

4    reasons?

5         A.    Yes.  And I told the supervisor.

6    And they still -- under the system it's showing

7    that, but this is what I was told, to go under

8    battery change.

9         Q.    Let's go to D. Hart-3.  It says,

10   Sherman is receiving his first written reprimand

11   for improper procedure and policy.  Sherman

12   swiped under battery change collectively for

13   over 19 minutes and was under returns

14   collectively for 19 minutes.  Sherman is

15   supposed to notify a supervisor in the case of

16   needing a new battery and there were no returns

17   on this specific night.

18              Can you explain what that was

19   about?

20        A.    Yes.

21        Q.    Do you remember it?

22        A.    Yes.  My jack died like four times

23   that night.  That's why it says collectively.

24   It wasn't at one time.  I don't know if one was

1   longer than another or which time.   But

2   collectively it was 19 minutes in a 12-hour

3   shift.

4        Q.    It was 19 minutes in 12 hours.   And

5   who was timing it?

6        A.    The system times it, but no person.

7   We wouldn't time it individually.   I was waiting

8   for my battery charge.   I told one supervisor.

9   The other supervisor is saying, well, did you

10  tell him.   I was like, he told me to swipe under

11  return.   One supervisor said, well, swipe under

12  this.

13       Q.    When you say swipe under this?

14       A.    He's saying swipe under returns and

15  another supervisor says, well, swipe under

16  battery change if that's what it is.   One of the

17  managers was like we don't like certain things

18  not showing under returns.   Well, he told me to

19  swipe under returns because there's no function

20  always for certain things.   They don't want you

21  under battery change for that.   I was like

22  that's what I'm doing, battery change.

23       Q.    Let's go to D. Hart-4.   It says,

24  Sherman is receiving his second written

Case 2:17-cv-04994-GJP   Document 1   Filed 11/06/17   Page 68 of 118

Sherman Hart                                      Hart vs. Philadelphia Coca-Cola
                        May 27, 2015

Page 48

1    reprimand for improper procedure and policy.

2    Sherman swiped under loader for 19 minutes

3    collectively.  Sherman is not to be under the

4    loading function unless told to do so.

5                    Is this the same -- this is also

6    September 28th.  You're getting a second written

7    report on September 28th.  It says October 7,

8    2014, but this was your violation.  Written

9    reprimand October 7, 2014.  We have one on the

10   5th and again on October 7th.  We just explained

11   the one that was on the 5th?

12        A.    Yes.

13        Q.    The one that was on the 5th was

14   Number 3.  And the one on Hart-4 is, correct me

15   if I'm wrong, October 7th, two days later?

16        A.    Yes.  This is coming from another

17   supervisor that I never worked with before.  And

18   I'm working with my supervisor and I'm telling

19   him what's going on.  And he's telling me what

20   function to swipe under.  Then another

21   supervisor working in another area looks up what

22   I'm under and then comes and tells me why am I

23   under this.  And I'm like I told my supervisor

24   there's no button for certain functions that we

1    do so he said go under loader.  If there's no

2    button for me to swipe under, what am I to do.

3    He was like swipe under loader.

4         Q.    Both of these, Number 3 and 4 talk

5    about 19 minutes?

6         A.    Yes.

7         Q.    Was it actually the same infraction

8    or a different day?

9         A.    They're saying it's two days later.

10    I don't get it either.  Both days it's the same

11    supervisor that I don't work with that was

12    harassing me for reasons I don't know.  And I

13    told them about that one.  I'm not working with

14    this supervisor, why does he keep coming and

15    bothering me.  And I would tell him who I'm

16    working for.

17         Q.    The supervisor you were working

18    for, what did that supervisor indicate to you?

19         A.    He told me what to do.

20              MS. GEE:  Objection.  Hearsay.

21              MR. POMERANTZ:  You can

22         answer.

23              THE WITNESS:  We didn't have

24         any problems.  I told that supervisor

Page 50

1    it's clearly stated I'm working with

2    the RD supervisor.  That supervisor

3    was only working with both employee

4    sections.  So I didn't have no

5    problems with him.  I was doing my

6    job.

7  BY MR. POMERANTZ:

8       Q.    So that was Hart-4.  Let's go to

9  Hart-5.  This is a third written.  On October

10  22, 2014, that's what it says, third written.

11  Sherman Hart is receiving his third written

12  reprimand for violation of policy and procedure

13  for the night of October 20th to the morning of

14  October 21st.  Sherman was under personal break

15  for more than 46 minutes combined throughout the

16  night.  This is excessive for personal breaks.

17            Can you explain that?

18       A.    Yes.  I was told, like I said, by

19  the supervisor I was working with to do

20  something, come off the system and repeat cases.

21  The cases that I was waiting for I had to find a

22  forklift guy to drop the pallets.  That's why I

23  took so long, which my supervisor knew.  And I

24  wrote a letter stating that day what happened.

1   He said they took that letter that I wrote for

2   this write up because I didn't want to have to

3   go through grievances.

4       Q.     You're looking at D-5A.  Let's go

5   back to D-5.  They're pretty much the same.

6              Both are written on October 22nd,

7   correct?

8       A.     Yes.

9       Q.     They're two separate infractions on

10  the same date?  On D. Hart-5 it says, Sherman is

11  receiving his third written reprimand.  And then

12  we have 5A says, receiving his second and third

13  written reprimand for violation of policy and

14  procedure for the night of October 21st?

15      A.     Yes.

16      Q.     And Sherman was under personal

17  break and then on the other -- there's one that

18  says you were under -- you worked for more than

19  35 minutes.  See that on 5A?  And then it says,

20  combined and after his 12:30 break.  Sherman was

21  told to go under returns to re-pick a pallet by

22  his supervisor Ezra Ellis.  The pallet he was

23  told to pick was R2A for RPD39 and was a total

24  of 5cs 5g BIB, 1cs.  You know what that means.

Page 52

1   I surely don't.

2                   What does that mean?

3         A.    That's the name of the cases, what

4   kind of flavor it was and the size.

5         Q.    And it says, this pallet should

6   have been done with a maximum of seven minutes.

7   ELS had this pallet.  Who is ELS?

8         A.    That's what they called the system

9   we're under, the timing system.

10        Q.    The pallet being picked within 5.4

11  minute window and Sherman picked this pallet

12  within the time frame on his original ticket,

13  but took a half hour to pick the second pallet.

14        A.    Previously the ticket was that all

15  these products was there the first time, that's

16  why I was able to do it in a timely manner.  The

17  second time I went back and told the supervisor

18  I need this product, it's not there.  I'm

19  waiting for the product to be brought to the

20  front.  In the meantime, I'm telling the

21  supervisor who's like, okay, wait for the

22  product.  Called it over the loud speak.  So I'm

23  waiting for the forklift driver to come.  That's

24  how long it took.

Page 53

1        Q.    · Did you have any control over the
2    forklifter?
3        A.    No.
4        Q.    Now, continue.
5        A.    At 12:30 is my break.  So in
6    between the time is still running.  Then after
7    my break I come back and it's still not dropped.
8    That's what makes it combined of 35 minutes,
9    counting my 10-minute break in between.
10       Q.    Let's go to D. Hart-6.  And Sherman
11   is receiving a written warning for using his
12   personal cell phone while working on January 6,
13   2014.  This infraction is against company
14   policy.  Any further violation will result in
15   progressive disciplinary action up to and
16   including termination.
17       A.    Yes.
18       Q.    And you wrote -- that's your
19   handwriting below that one break at the time?
20       A.    Yes.
21       Q.    And could you explain why you wrote
22   that?
23       A.    Because I was on break at the time
24   right next to the lunchroom that they said you

Page 54

1   were on the other side of the lunchroom.   They

2   have a yellow barricade divider I guess where

3   our jacks are.   Numerous people don't go to the

4   cafeteria on break, why are you singling me out,

5   I'm on break for a phone.   You have a phone on

6   this side of the pole.   Well, that's never been

7   told to me that I can't be on this side when

8   there's a lot of people up front in the work

9   area speaking on their phone.

10         Q.      There were other individuals on the

11   phone?

12         A.      Yes.   We're on break at the time.

13   I leave my phone up front in the locker where it

14   won't get broke because I broke a phone when I

15   first started.   Ever since I broke the phone, I

16   leave the phone in the locker.   I don't like to

17   go in the cafeteria because it's noisy.

18         Q.      Is there a problem if it's noisy?

19         A.      Yes, I couldn't hear.

20         Q.      Did you explain that?

21         A.      Well, I didn't explain it because

22   I'm on break.   And he knows I was on break.   I

23   didn't want to go through a grievance or any

24   situation to get further in conflict with the

1    supervisor.  I tried to avoid that when I can.

2         Q.    You didn't sign it.  It says, John

3    something other, Sherman?

4         A.    Yes.

5         Q.    Chose not to sign?

6         A.    Yes.  Because it was three of us

7    out there.  And he told us all.  How am I

8    getting a write up and no one else when you told

9    all of us to get back to work.  We had a minute

10   left on our break.

11        Q.    This says January 6, 2014 and

12   everything else says January 9th.

13               Can you explain that?

14        A.    I didn't get the write up until

15   days later on the 9th.

16        Q.    Were you advised of it on the 6th?

17        A.    Yes, on the 6th he said it, but I

18   didn't know I was going to get written up.  Like

19   I said, it was three of us.  But I guess three

20   days later I got written up for that.

21        Q.    You got written up on -- you got a

22   written reprimand on the 6th, but you didn't

23   receive it on the 6th?

24        A.    No, I received it on the 9th.

Page 56

1      Q.     And on the 9th you indicated what

2   you just testified to?

3      A.     Yes, I was shocked that I was

4   getting the write up.  I was on break.  It's

5   three days later.

6      Q.     Let's go to number 7.  As I was

7   making my way around the warehouse, as I do

8   every night, I noticed Sherman Hart in the back

9   of the warehouse next to the forklift pallet

10  jack battery area.  I then noticed Sherman was

11  on his phone talking.  I went into our employee

12  maintenance program and SAP.  What is that?

13     A.     I guess it's part of the computer

14  system.

15     Q.     To see what Sherman's job

16  description was and he was under a personal

17  break.  Knowing that being on the phone is

18  against company policy, I then spoke with our

19  other warehouse supervisor Rantz to see if

20  Sherman had asked to use the phone.  Rantz was

21  not notified by Sherman.  Can you explain?

22     A.     I never received this and Rantz

23  never said nothing to me about a write up.

24     Q.     You say you never received it?

1          A.      Yes, I never received this.  And

2     Rantz never said nothing to me about being on

3     the phone.  That's the supervisor I was working

4     with.  This is once again the other supervisor

5     who seems to always want to have something out

6     for me.

7          Q.      So you actually never received

8     this?

9          A.      No, I never even worked with this

10    supervisor.

11         Q.      Patrick Nolan, it says shop steward

12    there.  You weren't brought in on this?

13         A.      With these write ups, a lot of them

14    they sign and predate.  And I'm not around and

15    this one they never gave to me.  I never even

16    received this.

17         Q.      Have there been other instances

18    where they were predating?

19         A.      Yes, like we see the one on the 6th

20    and 9th.  They already signed it.  When I

21    finally got mine on the 9th with the signature,

22    that's when I got it three days later, I hear

23    about it.  I never heard about it that day or

24    the next day.  It was on the 9th.

Page 58

1    Q.    Let's go to Hart-8.  This is a

2    third written warning, November 6th.  As I was

3    making my way around the warehouse, I noticed

4    Sherman in the F Aisle showing an associate

5    something on his phone.  I reminded Sherman that

6    phones were not permitted.  He told me he was on

7    break.  So I explained to Sherman phones are not

8    allowed on the floor at any time.  I checked POD

9    time maintenance to see if Sherman was under the

10   break function being that it was already nearly

11   20 minutes past the 2:30 break time and Sherman

12   was not under the break function.

13            Can you explain about this

14   violation?

15   A.    I never said I was on break.  And I

16   was coming from break because I went to break

17   late that day and I was coming back from break,

18   me and another employee.  The supervisor claims

19   he seen a phone.  And I was like, what color is

20   my phone.  And he said, I seen a white phone.  I

21   don't even got a white phone.  My phone is red.

22   I didn't tell him the color.  I said my phone is

23   in the locker.  You want to see my phone.  It

24   wasn't my phone.  He was like --

Sherman Hart

Hart vs. Philadelphia Coca-Cola

May 27, 2015

Page 59

```
 1              MS. GEE:  Objection.  Hearsay.
 2              MR. POMERANTZ:  You can
 3      explain.
 4              THE WITNESS:  I went and got
 5      my phone and showed him my phone.  He
 6      was like, I got a light.  And there
 7      was two employees there to witness
 8      that.  And I had them to witness it.
 9      When I presented it at a grievance
10      they said, well, they have to be here.
11      We can't just call.  And I told my
12      union representative.  And he called
13      and he spoke with them and I texted
14      with the employee who seen it and said
15      he was going to do it.  And after I
16      was fired, I heard they were harassing
17      that employee.  And he was scared
18      to --
19              MS. GEE:  I'm going to object
20      and move to strike what he heard about
21      another employee.
22              THE WITNESS:  The other
23      employee also told the supervisor this
24      is my phone.
```

Page 60

```
 1                   MS. GEE:  Objection.  This is
 2          hearsay.
 3                   THE WITNESS:  Not hearsay.  He
 4          told them.  I heard it.  He told the
 5          supervisor this.  He said this is my
 6          phone.  He said out of his mouth, this
 7          is my phone.  He didn't have a phone.
 8          And he's like why do you want to help
 9          this guy out.
10     BY MR. POMERANTZ:
11          Q.   These were all employees?
12          A.   Yes.  And he definitely told him
13     this is my phone.  And he basically was like he
14     wasn't going to remove the write up.  I didn't
15     have a phone and I showed him the phone.  It had
16     my logo on it and everything.  After he seen it,
17     then he switched his story.  And he said I seen
18     a light.  And he's telling you it's his phone
19     and you're still trying to put it on me as my
20     phone.  He wouldn't hear it.  The same
21     supervisor I never worked with.
22                   MR. POMERANTZ:  I have no
23          further questions.
24                   MS. GEE:  No follow up for me.
```

Sherman Hart

May 27, 2015

Hart vs. Philadelphia Coca-Cola

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ERRATA SHEET

- - - - -

PAGE   LINE  CORRECTION   REASON FOR CORRECTION

Page 63

Page 64

1          CERTIFICATION

2          - - - - - -

3          I hereby certify that the testimony

4     and the proceedings in the aforegoing matter

5     are contained fully and accurately in the

6     stenographic notes taken by me, and that the

7     copy is a true and correct transcript of the

8     same.

9

10

11

12          JEN SZOMBATHY

13          Professional Court Reporter

14

15          The foregoing certification does

16     not apply to any reproduction of the same by

17     any means unless under the direct control

18     and/or supervision of the certifying

19     shorthand reporter.

20          - - - - - -

21

22

23

24

# EXHIBIT D

Law Offices

# GERALD JAY POMERANTZ & ASSOCIATES, P.C

7th Floor Stephen Girard Building
21 S. 12th Street
Philadelphia, PA  19107-3600
Telephone:  215-569-8866
Facsimile:  215-569-8867

GERALD JAY POMERANTZ
gjpomlaw@hotmail.com

Montgomery County
508 Spring Avenue
Elkins Park, PA   19027
TELEPHONE  (267) 255-7229

July 13, 2015

Judge Tina Maria Rago
PA Workers Comp.
110 N. 8th Street, 4th Floor
Philadelphia, PA    19107-5157

Re:     Sherman Hart v.
Philadelphia Coca-Cola Bottling
WCAIS Claim #        7417594
Dispute #              DSP-7417594-1
WCID #                 W 101196095

Dear Judge Rago:

Although I attended hearing on behalf of Mr. Hart in the above matter, I have not formally entered my appearance on his behalf.    Enclosed is appropriate Notice of Appearance.

Thank you very much.

Respectfully,

GERALD JAY POMERANTZ

GJP:net
Enc.

cc w/enc.    Anthony J. Bilotti, Esquire

PENNSYLVANIA DEPARTMENT OF LABOR & INDUSTRY

WORKERS COMPENSATION BUREAU

In the matter of:

Sherman Hart
vs.
Philadelphia Coca-Cola Bottling

| | |
|---|---|
| WCAIS Claim # | 7417594 |
| Dispute # | DSP-7417594-1 |
| Employee WCID # | W 101196095 |
| D/Injury | 10/22/14 |

## NOTICE OF APPEARANCE

Please enter my appearance in the above captioned matter on behalf of:

Sherman Hart

I am authorized to accept service on behalf of said participant in this matter.

### (CHECK ONE)

[X] On the basis of this notice, I request a copy of each document hereafter issued to my client by the Pennsylvania Human Relations Commission in this matter.

[ ] I am already receiving or have access to a copy of each document issued to my client by the Pennsylvania Human Relations Commission in this matter (alone, or in a consolidated proceeding) and do not, on the basis of this notice, require an additional copy.

_____
Signature

Gerald Jay Pomerantz
Name (Printed)

21 S. 12th Street, 7th Floor
P.O. Address

Philadelphia, PA   19107
City, State, and Zip Code

215-569-866
Telephone (including area code)

_____
Date

# EXHIBIT E

1

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF LABOR AND INDUSTRY
BUREAU OF WORKERS' COMPENSATION


SHERMAN HART

    vs.             BUREAU CLAIM NO. 7417594

PHILADELPHIA COCA-COLA

ORIGINAL


Oral deposition of LAWRENCE

GOREN, M.D., taken at the law offices of

Anthony J. Bilotti & Associates, LLC,

Rose Tree Corporate Center, Building II,

Suite 4035, 1400 North Providence Road,

Media, Pennsylvania, on Thursday, July

23, 2015, commencing at 10:08 a.m.,

before John M. Colasante, a Registered

Professional Reporter and Notary Public.

2

APPEARANCES:

ANTHONY J. BILOTTI & ASSOCIATES, LLC
ELIZABETH GEE, ESQUIRE
egee@bilottilaw.com
Rose Tree Corporate Center
1400 North Providence Road
Building II, Suite 4035
Media, Pennsylvania 19063
484-444-4400
Counsel for Defendant


EXAMINATION INDEX

LAWRENCE GOREN, M.D.
    DIRECT BY MS. GEE                  4
    DIRECT BY MS. GEE                  5

EXHIBIT INDEX

MARKED

30(b)(6) Ponturo

7      Letter dated 1/13/15 to Mr. Hart from Ms.    18
       Cortez, and letter dated 2/2/15 to Mr.
       Hart from Ms. Cortez


D-Goren

1      Letter dated 7/10/15 to Mr. Pomerantz     4
       from Mr. Bilotti

2      Report of date of visit of 10/22/14     11

3      Work Status Report dated 12/22/14     12

4      Work Status Report dated 12/29/14     13

5      Report of Dr. Goren dated 11/26/14     15

6      Work Status Report dated 11/26/14     16

**LAWRENCE GOREN, M.D.**

3

1            LAWRENCE GOREN, M.D., having

2    been duly sworn, was examined and

3    testified as follows:

4            MS. GEE:  We are here in the

5    matter of Sherman Hart versus Coca-Cola

6    to take the trial deposition of

7    Dr. Lawrence Goren in lieu of his live

8    testimony before a workers' compensation

9    judge.

10           Earlier this morning, we

11   received a call from Gerald Pomerantz's

12   office.  He indicated that he would not

13   be attending today's deposition.  I did

14   call him and speak with him personally.

15   He indicated that he would not be

16   attending, and he did not want to

17   participate by phone, but that we should

18   proceed as scheduled.

19          I'm going to have marked and

20   enter into evidence what we'll mark as

21   D-Goren-1, which is a letter dated July

22   10th, 2015, with an attached Notice of

23   Oral Deposition, which notified

24   Mr. Pomerantz that the deposition of

LAWRENCE GOREN, M.D.

4

 1   Dr. Goren would take place today.

 2            So I'll enter that into

 3   evidence, D-Goren-1.

 4            (Exhibit D-Goren-1 was marked

 5   for identification.)

 6   DIRECT EXAMINATION ON QUALIFICATIONS

 7   BY MS. GEE:

 8   Q.    Dr. Goren, would you please state

 9   your name for the record, please.

10   A.    It's Lawrence Goren.

11   Q.    Are you licensed to practice

12   medicine in the Commonwealth of

13   Pennsylvania?

14   A.    I am.

15   Q.    We did not meet prior to today's

16   deposition to discuss the merits of this

17   case, did we?

18   A.    No, we did not.

19   Q.    Okay.  Could you briefly tell us

20   about some of your education and

21   training?

22   A.    I was -- I graduated from

23   Hahnemann Medical College in 1978.  I

24   did a general surgical residency and

**LAWRENCE GOREN, M.D.**

5

1  cardiovascular fellowship, finished in

2  1985.

3       Subsequent to that, I began to do

4  occupational medicine, which I've done

5  exclusively since approximately 1985,

6  1986, and ultimately formed a company

7  called Onsite Innovations, which

8  provides on-site occupational medical

9  care to employees both local in the

10  Philadelphia area and throughout the

11  country.  I own the company.  And I do

12  still practice and see patients in the

13  Philadelphia area.

14  Q.   How long have you had the Onsite

15  Innovations practice within Coca-Cola?

16  A.   A little more than ten years.

17          MS. GEE:  Okay.  I would be

18  offering Dr. Goren as an expert in

19  occupational medicine.

20          DIRECT EXAMINATION

21  BY MS. GEE:

22  Q.   Are there other medical

23  practitioners within Onsite Innovations?

24  A.   Yes, there are several.

**LAWRENCE GOREN, M.D.**

6

1   Q.    And could you describe these

2   practitioners?

3   A.    We have a group of practitioners,

4   from other physicians, to nurse

5   practitioners, physicians' assistants,

6   athletic trainers, emergency medical

7   technicians, paramedics, and medical

8   assistants.

9   Q.    Do you oversee the physicians'

10  assistants and nurse practitioners and

11  the other practitioners that you've

12  mentioned?

13  A.    I oversee some of them because of

14  compliance issues.  There is a limited

15  amount that I oversee.  So others do as

16  well.  But I oversee certain physicians'

17  assistants and nurse practitioners.  I

18  do.

19  Q.    And you trust the expertise of

20  these practitioners to treat and

21  evaluate patients?

22  A.    Absolutely.

23  Q.    Is Debra Cortez a physicians'

24  assistant at the Coca-Cola location of

**LAWRENCE GOREN, M.D.**

7

1    Onsite Innovations?

2    A.    Yes, she is.

3    Q.    Is it a regular part of your

4    practice to review the reports and

5    records taken by your PAs, such as Debra

6    Cortez, and any nurse practitioners?

7    A.    Yes.

8    Q.    Do you rely on their reports in

9    forming diagnoses and treatment plans?

10   A.    Absolutely.

11   Q.    Did you see and treat Sherman Hart

12   in conjunction with an October 22nd,

13   2014 work injury at Coca-Cola?

14   A.    Yes, I did.

15   Q.    And in your years of experiencing

16   treating employees of Coca-Cola, have

17   you become generally familiar with the

18   job duties of various positions?

19   A.    Absolutely.

20   Q.    Would you say you're just

21   generally familiar with the job duties

22   of a general warehouse worker?

23   A.    I absolutely am.

24   Q.    When was Mr. Hart first seen for

**LAWRENCE GOREN, M.D.**

8

1   treatment at Onsite Innovations?

2   A.    He was seen in our Onsite clinic

3   on October 22nd, 2014 by Miss Cortez.

4   Q.    Did Miss Cortez prepare a report

5   in conjunction with that office visit?

6   A.    She did.

7   Q.    Did you review this report and

8   sign off on it?

9   A.    I reviewed it and countersigned

10  it, yes.

11  Q.    What history did Mr. Hart provide

12  on that date?

13  A.    He stated that on 10/22/2014,

14  while working in the warehouse, and

15  performing his usual duties, he was

16  lifting a case of products, and his left

17  foot caught in the plastic of the pallet

18  where he was lifting, and when he pushed

19  to remove it from the case that he

20  picked up, he felt pain to his lower

21  back and into his groin.

22        And he also related the history

23  that he was still continuing to have

24  right lower back pain, with radiation

1  into the right groin and the leg, with

2  no paresthesias.

3       He was seen just prior to that in

4  the emergency room at Aria Frankford

5  Campus, was given some Toradol and a

6  prescription for Toradol and Flexeril

7  before his release.

8       And that was the initial

9  presentation besides going into some

10  prior history that he had.

11  Q.   Okay.  And did Miss Cortez perform

12  a physical examination on that date?

13  A.   She did.  She did.

14  Q.   Did she note anything of

15  significance to you?

16  A.   He had complaints of tenderness in

17  the right-sided musculature, and he had

18  limited range of motion in all planes

19  because of complaints of pain.

20       However, his nerve root tests were

21  negative, straight leg raising exam was

22  negative, and only -- with reproduction

23  for radicular pain, but only axial right

24  lumbar pain.  She did notice, again,

**LAWRENCE GOREN, M.D.**

10

1  from a history standpoint that there

2  were no radicular complaints on any of

3  these maneuvers.

4       So what's of significance is that

5  he had axial or back pain that was

6  largely muscular, without any positive

7  neurologic findings or signs of nerve

8  root irritation that could be associated

9  with either a nerve root pull or a

10  herniated disc.

11  Q.   What was Mr. Hart's initial

12  diagnosis?

13  A.   It was a lumbar strain and sprain.

14  Q.   Was he released to work?

15  A.   He was.  He was released to

16  modified duty at that time.  He was

17  given Naprosyn to be taken twice daily

18  with food.  He was also given

19  methocarbamol, which is a muscle

20  relaxer, to be taken at bedtime as

21  needed.  And he was scheduled to return

22  to be seen in the clinic on the 28th.

23  Q.   Okay.  And I'm going to show you

24  what we'll have marked as D-Goren-2.

**LAWRENCE GOREN, M.D.**

11

1      Is this a copy of the report that

2  Miss Cortez authored and you signed off

3  on pertaining to an office visit of

4  October 22nd --

5  A.  Yes, it is.

6  Q.   -- 2014?

7        MS. GEE:  I'll have that

8  entered as D-Goren-2.

9        (Exhibit D-Goren-2 was marked

10  for identification.)

11  BY MS. GEE:

12  Q.  Was a work status report filled

13  out in conjunction with that visit?

14  A.  It was.

15  Q.  And according to this report, what

16  were the work restrictions at that time?

17  A.  The work restrictions were that he

18  do limited bending at the waist, and he

19  stand and sit as tolerated.  He could

20  climb ladders and he could drive.  He

21  could use his -- these are the

22  non-restricted areas.  He could use his

23  upper extremities for grasping and for

24  moving about without any restrictions.

LAWRENCE GOREN, M.D.

12

1    So the pointed restrictions were
2  limiting bending and sitting and
3  standing as tolerated.
4  Q.    And I'm going to show you what
5  we'll have marked as D-Goren-3.
6    Is this a true and accurate copy
7  of the work status report?
8  A.    Yes, it is.
9         MS. GEE:  I'll have that
10  entered into evidence as well.
11         (Exhibit D-Goren-3 was marked
12  for identification.)
13  BY MS. GEE:
14  Q.    Did Mr. Hart return to the clinic
15  after that initial visit?
16  A.    He was seen on the 29th.  And I
17  don't have the accompanying note for
18  that.  However, I do know that at that
19  time he was placed on literally the same
20  restrictions, but he was also placed in
21  physical therapy.
22  Q.    And was a work status report
23  filled out in conjunction with an office
24  visit of 10/29/14?

**LAWRENCE GOREN, M.D.**

13

1   A.   It was.

2   Q.   And you previously stated that the

3   same restrictions applied as the visit

4   of October 22nd, 2014?

5   A.   Yes.

6   Q.   And I'm showing you a report we'll

7   have marked as D-Goren-4, a work status

8   report of 10/29/14.

9        Is this is a true and accurate

10  copy of that report?

11  A.   It is.

12        MS. GEE:   I'll have that

13  entered into evidence.

14        (Exhibit D-Goren-4 was marked

15  for identification.)

16  BY MS. GEE:

17  Q.   Did Mr. Hart return to the Onsite

18  Innovations Clinic after that?

19  A.   Yes.

20  Q.   And what was that date?

21  A.   He was seen by me on 11/26/14.

22  Q.   And did you personally examine him

23  on that date?

24  A.   I did.

LAWRENCE GOREN, M.D.

14

1   Q.   Can you explain what, if anything,

2   you found on that examination?

3   A.   In terms of his history, he stated

4   that he was doing a little bit better.

5   He still complained of significant

6   stiffness in his low back, and low back

7   pain, when he was up and moving and

8   repetitively bending, although he was

9   restricted from the warehouse, just in

10  terms of general things that he did.

11       But what I don't put here, and

12  because I exclude it, is he didn't have

13  radicular complaints, he didn't have

14  paresthesias.  He had none of that.

15  These were the only complaints that he

16  had.  That's the way I do my notes.

17  Q.   And you noted that you had sent

18  him to physical therapy?

19  A.   Yes.

20  Q.   Are you aware if he attended

21  physical therapy?

22  A.   He did.

23  Q.   He did?

24  A.   He did.

15

1  Q.    And did you prepare a report in

2  conjunction with the November 26th, 2014

3  office visit?

4  A.    Yes.   Yes.

5  Q.    We'll have marked the report that

6  you authored as D-Goren-5.   Is this a

7  true and accurate copy of the report?

8  A.    It is.

9         MS. GEE:   I'll have that

10  entered into evidence.

11         (Exhibit D-Goren-5 was marked

12  for identification.)

13  BY MS. GEE:

14  Q.    Did you fill out, or it looks like

15  Miss Cortez, fill out a work status

16  report in conjunction with the November

17  26th, 2014 office visit?

18  A.    Yes.

19  Q.    What, if any, restrictions did you

20  place on the claimant at that time?

21  A.    The same restrictions as before,

22  that he -- I only limited his sit,

23  stand, walking to as tolerated.   Bending

24  at the waist was limited.   And there

LAWRENCE GOREN, M.D.

16

1   were no restrictions on climbing ladders

2   or driving.  So it was limited bending

3   at the waist and sit, stand and walk as

4   tolerated.

5   Q.   Now, I see that it says "Next

6   appointment at Coca-Cola Medical" on

7   this work status report.  What does this

8   indicate?

9   A.   It says he was to return on 12/17

10  at 6:00 p.m., because the office is open

11  then, and he was a second-shifter at

12  that time.

13  Q.   Okay.  I'm going to show you what

14  we'll have marked as D-Goren-6.

15       Is this a true and accurate copy

16  of the work status report in conjunction

17  with an office visit of 11/26/14?

18  A.   Yes.

19       MS. GEE:  I'll have that

20  entered into evidence.

21       (Exhibit D-Goren-6 was marked

22  for identification.

23  BY MS. GEE:

24  Q.   Now, did Mr. Hart return to Onsite

**LAWRENCE GOREN, M.D.**

17

1  Innovations after that?

2  A.    No.

3  Q.    And I'm going to show you what

4  we'll have marked as D-Goren-7.  It's

5  two pages.

6      Can you identify these two

7  documents for me?

8  A.    Yes.   They are letters that were

9  sent on 1/13, and again on February 2nd,

10  because Mr. Hart did not return, was

11  non-compliant.   There were several

12  attempts to contact him.   He had stopped

13  attending everything, and was lost to

14  follow-up.   So these notes were sent to

15  him.

16  Q.    What are the dates of these

17  letters?

18  A.    1/13/15 and February 2nd, 2015.

19  Q.    Did you hear from the claimant at

20  all as a result of sending these two

21  letters?

22  A.    No.

23  Q.    Was he discharged to full duty as

24  of February 2nd, 2015?

**LAWRENCE GOREN, M.D.**

18

1    A.   Yes.  It was an administrative

2    discharge.  And as stated, we could only

3    deduce that he needed no further care

4    and was capable of full duty.

5            MS. GEE:  Those are all the

6    questions I have for you.  Thank you.

7            I'm sorry.  One more thing.

8    I forgot to enter this into evidence.

9            We'll have these two letters

10   marked collectively as D-Goren-7.

11   BY MS. GEE:

12   Q.   Are these true and accurate copies

13   of the letters that were sent on 1/13/15

14   and 2/2/15 to Mr. Hart?

15   A.   Yes.

16           MS. GEE:  And we'll enter

17   these into evidence, D-Goren-7.

18           Okay.  Those are all the

19   questions that I have for you.

20           (Exhibit D-Goren-7 was marked

21   for identification.)

22           (Deposition concluded at

23   10:19 a.m.)

24

19

1        CERTIFICATION

2

3        I, JOHN M. COLASANTE,

4    Registered Professional Reporter and

5    Notary Public in and for the

6    Commonwealth of Pennsylvania, hereby

7    certify that the foregoing is a true and

8    accurate transcript of the deposition of

9    said witness who was first duly sworn by

10   me on the date and place herein before

11   set forth.

12        I FURTHER CERTIFY that I am

13   neither attorney nor counsel for, not

14   related to nor employed by any of the

15   parties to the action in which this

16   deposition was taken; and further that I

17   am not a relative or employee of any

18   attorney or counsel employed in this

19   action, nor am I financially interested

20   in this case.

21

22   _____
     JOHN M. COLASANTE
23   Registered Professional Reporter
     and Notary Public
24

**A**

Absolutely (4)
 6:22;7:10,19,23
accompanying (1)
 12:17
according (1)
 11:15
accurate (5)
 12:6;13:9;15:7;
 16:15;18:12
administrative (1)
 18:1
again (2)
 9:24;17:9
although (1)
 14:8
amount (1)
 6:15
applied (1)
 13:3
appointment (1)
 16:6
approximately (1)
 5:5
area (2)
 5:10,13
areas (1)
 11:22
Aria (1)
 9:4
assistant (1)
 6:24
assistants (4)
 6:5,8,10,17
associated (1)
 10:8
athletic (1)
 6:6
attached (1)
 3:22
attempts (1)
 17:12
attended (1)
 14:20
attending (3)
 3:13,16;17:13
authored (2)
 11:2;15:6
aware (1)
 14:20
axial (2)
 9:23;10:5

**B**

back (5)
 8:21,24;10:5;14:6,
 6
become (1)
 7:17
bedtime (1)

10:20
began (1)
 5:3
bending (5)
 11:18;12:2;14:8;
 15:23;16:2
besides (1)
 9:9
better (1)
 14:4
bit (1)
 14:4
both (1)
 5:9
briefly (1)
 4:19

**C**

call (2)
 3:11,14
called (1)
 5:7
Campus (1)
 9:5
Can (2)
 14:1;17:6
capable (1)
 18:4
cardiovascular (1)
 5:1
care (2)
 5:9;18:3
case (3)
 4:17;8:16,19
caught (1)
 8:17
certain (1)
 6:16
claimant (2)
 15:20;17:19
climb (1)
 11:20
climbing (1)
 16:1
clinic (4)
 8:2;10:22;12:14;
 13:18
Coca-Cola (6)
 3:5;5:15;6:24;7:13,
 16;16:6
collectively (1)
 18:10
College (1)
 4:23
Commonwealth (1)
 4:12
company (2)
 5:6,11
compensation (1)
 3:8
complained (1)
 14:5

complaints (5)
 9:16,19;10:2;
 14:13,15
compliance (1)
 6:14
concluded (1)
 18:22
conjunction (7)
 7:12;8:5;11:13;
 12:23;15:2,16;16:16
contact (1)
 17:12
continuing (1)
 8:23
copies (1)
 18:12
copy (5)
 11:1;12:6;13:10;
 15:7;16:15
Cortez (7)
 6:23;7:6;8:3,4;
 9:11;11:2;15:15
countersigned (1)
 8:9
country (1)
 5:11

**D**

daily (1)
 10:17
date (4)
 8:12;9:12;13:20,23
dated (1)
 3:21
dates (1)
 17:16
Debra (2)
 6:23;7:5
deduce (1)
 18:3
deposition (6)
 3:6,13,23,24;4:16;
 18:22
describe (1)
 6:1
D-Goren-1 (3)
 3:21;4:3,4
D-Goren-2 (3)
 10:24;11:8,9
D-Goren-3 (2)
 12:5,11
D-Goren-4 (2)
 13:7,14
D-Goren-5 (2)
 15:6,11
D-Goren-6 (2)
 16:14,21
D-Goren-7 (4)
 17:4;18:10,17,20
diagnoses (1)
 7:9
diagnosis (1)

10:12
DIRECT (2)
 4:6;5:20
disc (1)
 10:10
discharge (1)
 18:2
discharged (1)
 17:23
discuss (1)
 4:16
documents (1)
 17:7
done (1)
 5:4
Dr (4)
 3:7;4:1,8;5:18
drive (1)
 11:20
driving (1)
 16:2
duly (1)
 3:2
duties (3)
 7:18,21;8:15
duty (3)
 10:16;17:23;18:4

**E**

Earlier (1)
 3:10
education (1)
 4:20
either (1)
 10:9
emergency (2)
 6:6;9:4
employees (2)
 5:9;7:16
enter (4)
 3:20;4:2;18:8,16
entered (5)
 11:8;12:10;13:13;
 15:10;16:20
evaluate (1)
 6:21
evidence (8)
 3:20;4:3;12:10;
 13:13;15:10;16:20;
 18:8,17
exam (1)
 9:21
EXAMINATION (4)
 4:6;5:20;9:12;14:2
examine (1)
 13:22
examined (1)
 3:2
exclude (1)
 14:12
exclusively (1)
 5:5

Exhibit (7)
 4:4;11:9;12:11;
 13:14;15:11;16:21;
 18:20
experiencing (1)
 7:15
expert (1)
 5:18
expertise (1)
 6:19
explain (1)
 14:1
extremities (1)
 11:23

**F**

familiar (2)
 7:17,21
February (3)
 17:9,18,24
fellowship (1)
 5:1
felt (1)
 8:20
fill (2)
 15:14,15
filled (2)
 11:12;12:23
findings (1)
 10:7
finished (1)
 5:1
first (1)
 7:24
Flexeril (1)
 9:6
follows (1)
 3:3
follow-up (1)
 17:14
food (1)
 10:18
foot (1)
 8:17
forgot (1)
 18:8
formed (1)
 5:6
forming (1)
 7:9
found (1)
 14:2
Frankford (1)
 9:4
full (2)
 17:23;18:4
further (1)
 18:3

**G**

GEE (17)

SHERMAN HART v.
PHILADELPHIA COCA-COLA

LAWRENCE GOREN, M.D.
July 23, 2015

3:4;4:7;5:17,21;
11:7,11;12:9,13;
13:12,16;15:9,13;
16:19,23;18:5,11,16
**general (3)**
4:24;7:22;14:10
**generally (2)**
7:17,21
**Gerald (1)**
3:11
**given (3)**
9:5;10:17,18
**GOREN (6)**
3:1,7;4:1,8,10;5:18
**graduated (1)**
4:22
**grasping (1)**
11:23
**groin (2)**
8:21;9:1
**group (1)**
6:3

**H**

**Hahnemann (1)**
4:23
**Hart (9)**
3:5;7:11,24;8:11;
12:14;13:17;16:24;
17:10;18:14
**Hart's (1)**
10:11
**hear (1)**
17:19
**herniated (1)**
10:10
**history (5)**
8:11,22;9:10;10:1;
14:3

**I**

**identification (7)**
4:5;11:10;12:12;
13:15;15:12;16:22;
18:21
**identify (1)**
17:6
**indicate (1)**
16:8
**indicated (2)**
3:12,15
**initial (3)**
9:8;10:11;12:15
**injury (1)**
7:13
**Innovations (7)**
5:7,15,23;7:1;8:1;
13:18;17:1
**into (11)**
3:20;4:2;8:21;9:1,
9;12:10;13:13;15:10;

16:20;18:8,17
**irritation (1)**
10:8
**issues (1)**
6:14

**J**

**job (2)**
7:18,21
**judge (1)**
3:9
**July (1)**
3:21

**L**

**ladders (2)**
11:20;16:1
**largely (1)**
10:6
**LAWRENCE (3)**
3:1,7;4:10
**left (1)**
8:16
**leg (2)**
9:1,21
**letter (1)**
3:21
**letters (2)**
17:8,17,21;18:9,13
**licensed (1)**
4:11
**lieu (1)**
3:7
**lifting (2)**
8:16,18
**limited (6)**
6:14;9:18;11:18;
15:22,24;16:2
**limiting (1)**
12:2
**literally (1)**
12:19
**little (2)**
5:16;14:4
**live (1)**
3:7
**local (1)**
5:9
**location (1)**
6:24
**long (1)**
5:14
**looks (1)**
15:14
**lost (1)**
17:13
**low (2)**
14:6,6
**lower (2)**
8:20,24
**lumbar (2)**

9:24;10:13

**M**

**maneuvers (1)**
10:3
**mark (1)**
3:20
**marked (15)**
3:19;4:4;10:24;
11:9;12:5,11;13:7,
14;15:5,11;16:14,21;
17:4;18:10,20
**matter (1)**
3:5
**MD (1)**
3:1
**Medical (6)**
4:23;5:8,22;6:6,7;
16:6
**medicine (3)**
4:12;5:4,19
**meet (1)**
4:15
**mentioned (1)**
6:12
**merits (1)**
4:16
**methocarbamol (1)**
10:19
**Miss (5)**
8:3,4;9:11;11:2;
15:15
**modified (1)**
10:16
**more (2)**
5:16;18:7
**morning (1)**
3:10
**motion (1)**
9:18
**moving (2)**
11:24;14:7
**muscle (1)**
10:19
**muscular (1)**
10:6
**musculature (1)**
9:17

**N**

**name (1)**
4:9
**Naprosyn (1)**
10:17
**needed (2)**
10:21;18:3
**negative (2)**
9:21,22
**nerve (3)**
9:20;10:7,9
**neurologic (1)**

10:7
**Next (1)**
16:5
**non-compliant (1)**
17:11
**none (1)**
14:14
**non-restricted (1)**
11:22
**note (2)**
9:14;12:17
**noted (1)**
14:17
**notes (2)**
14:16;17:14
**Notice (2)**
3:22;9:24
**notified (1)**
3:23
**November (2)**
15:2,16
**nurse (4)**
6:4,10,17;7:6

**O**

**occupational (3)**
5:4,8,19
**October (4)**
7:12;8:3;11:4;13:4
**off (2)**
8:8;11:2
**offering (1)**
5:18
**office (8)**
3:12;8:5;11:3;
12:23;15:3,17;16:10,
17
**One (1)**
18:7
**only (5)**
9:22,23;14:15;
15:22;18:2
**Onsite (8)**
5:7,14,23;7:1;8:1,
2;13:17;16:24
**on-site (1)**
5:8
**open (1)**
16:10
**Oral (1)**
3:23
**others (1)**
6:15
**out (5)**
11:13;12:23;15:14,
15
**oversee (4)**
6:9,13,15,16
**own (1)**
5:11

**P**

**pages (1)**
17:5
**pain (7)**
8:20,24;9:19,23,
24;10:5;14:7
**pallet (1)**
8:17
**paramedics (1)**
6:7
**paresthesias (2)**
9:2;14:14
**part (1)**
7:3
**participate (1)**
3:17
**PAs (1)**
7:5
**patients (2)**
5:12;6:21
**Pennsylvania (1)**
4:13
**perform (1)**
9:11
**performing (1)**
8:15
**personally (2)**
3:14;13:22
**pertaining (1)**
11:3
**Philadelphia (2)**
5:10,13
**phone (1)**
3:17
**physical (4)**
9:12;12:21;14:18,
21
**physicians (1)**
6:4
**physicians' (4)**
6:5,9,16,23
**picked (1)**
8:20
**place (2)**
4:1;15:20
**placed (2)**
12:19,20
**planes (1)**
9:18
**plans (1)**
7:9
**plastic (1)**
8:17
**please (2)**
4:8,9
**pm (1)**
16:10
**pointed (1)**
12:1
**Pomerantz (1)**
3:24

SHERMAN HART v.
PHILADELPHIA COCA-COLA

LAWRENCE GOREN, M.D.
July 23, 2015

Pomerantz's (1)
  3:11
positions (1)
  7:18
positive (1)
  10:6
practice (4)
  4:11;5:12,15;7:4
practitioners (9)
  5:23;6:2,3,5,10,11,
  17,20;7:6
prepare (2)
  8:4;15:1
prescription (1)
  9:6
presentation (1)
  9:9
previously (1)
  13:2
prior (3)
  4:15;9:3,10
proceed (1)
  3:18
products (1)
  8:16
provide (1)
  8:11
provides (1)
  5:8
pull (1)
  10:9
pushed (1)
  8:18
put (1)
  14:11

Q

QUALIFICATIONS (1)
  4:6

R

radiation (1)
  8:24
radicular (3)
  9:23;10:2;14:13
raising (1)
  9:21
range (1)
  9:18
received (1)
  3:11
record (1)
  4:9
records (1)
  7:5
regular (1)
  7:3
related (1)
  8:22
relaxer (1)
  10:20

release (1)
  9:7
released (2)
  10:14,15
rely (1)
  7:8
remove (1)
  8:19
repetitively (1)
  14:8
report (16)
  8:4,7;11:1,12,15;
  12:7,22;13:6,8,10;
  15:1,5,7,16;16:7,16
reports (2)
  7:4,8
reproduction (1)
  9:22
residency (1)
  4:24
restricted (1)
  14:9
restrictions (9)
  11:16,17,24;12:1,
  20;13:3;15:19,21;
  16:1
result (1)
  17:20
return (6)
  10:21;12:14;13:17;
  16:9,24;17:10
review (2)
  7:4;8:7
reviewed (1)
  8:9
right (3)
  8:24;9:1,23
right-sided (1)
  9:17
room (1)
  9:4
root (3)
  9:20;10:8,9

S

same (3)
  12:19;13:3;15:21
scheduled (2)
  3:18;10:21
second-shifter (1)
  16:11
sending (1)
  17:20
sent (4)
  14:17;17:9,14;
  18:13
several (2)
  5:24;17:11
Sherman (2)
  3:5;7:11
show (4)
  10:23;12:4;16:13;

17:3
showing (1)
  13:6
sign (1)
  8:8
signed (1)
  11:2
significance (2)
  9:15;10:4
significant (1)
  14:5
signs (1)
  10:7
sit (3)
  11:19;15:22;16:3
sitting (1)
  12:2
sorry (1)
  18:7
speak (1)
  3:14
sprain (1)
  10:13
stand (3)
  11:19;15:23;16:3
standing (1)
  12:3
standpoint (1)
  10:1
state (1)
  4:8
stated (4)
  8:13;13:2;14:3;
  18:2
status (7)
  11:12;12:7,22;
  13:7;15:15;16:7,16
stiffness (1)
  14:6
still (3)
  5:12;8:23;14:5
stopped (1)
  17:12
straight (1)
  9:21
strain (1)
  10:13
Subsequent (1)
  5:3
surgical (1)
  4:24
sworn (1)
  3:2

T

technicians (1)
  6:7
ten (1)
  5:16
tenderness (1)
  9:16
terms (2)

14:3,10
testified (1)
  3:3
testimony (1)
  3:8
tests (1)
  9:20
therapy (3)
  12:21;14:18,21
throughout (1)
  5:10
today (1)
  4:1
today's (2)
  3:13;4:15
tolerated (4)
  11:19;12:3;15:23;
  16:4
Toradol (2)
  9:5,6
trainers (1)
  6:6
training (1)
  4:21
treat (2)
  6:20;7:11
treating (1)
  7:16
treatment (2)
  7:9;8:1
trial (1)
  3:6
true (5)
  12:6;13:9;15:7;
  16:15;18:12
trust (1)
  6:19
twice (1)
  10:17
two (4)
  17:5,6,20;18:9

U

ultimately (1)
  5:6
up (2)
  8:20;14:7
upper (1)
  11:23
use (2)
  11:21,22
usual (1)
  8:15

V

various (1)
  7:18
versus (1)
  3:5
visit (9)
  8:5;11:3,13;12:15,

24;13:3;15:3,17;
16:17

W

waist (3)
  11:18;15:24;16:3
walk (1)
  16:3
walking (1)
  15:23
warehouse (3)
  7:22;8:14;14:9
way (1)
  14:16
what's (1)
  10:4
within (2)
  5:15,23
without (2)
  10:6;11:24
work (11)
  7:13;10:14;11:12,
  16,17;12:7,22;13:7;
  15:15;16:7,16
worker (1)
  7:22
workers' (1)
  3:8
working (1)
  8:14

Y

years (2)
  5:16;7:15

1

1/13 (1)
  17:9
1/13/15 (2)
  17:18;18:13
10/22/2014 (1)
  8:13
10/29/14 (2)
  12:24;13:8
10:19 (1)
  18:23
10th (1)
  3:22
11/26/14 (2)
  13:21;16:17
12/17 (1)
  16:9
1978 (1)
  4:23
1985 (2)
  5:2,5
1986 (1)
  5:6

brusilow & associates
215.772.1717

**2**

**2/2/15 (1)**
    18:14
**2014 (6)**
    7:13;8:3;11:6;
    13:4;15:2,17
**2015 (3)**
    3:22;17:18,24
**22nd (4)**
    7:12;8:3;11:4;13:4
**26th (2)**
    15:2,17
**28th (1)**
    10:22
**29th (1)**
    12:16
**2nd (3)**
    17:9,18,24

**6**

**6:00 (1)**
    16:10

# ANTHONY J. BILOTTI & ASSOCIATES, LLC

Rose Tree Corporate Center
1400 N. Providence Road
Building II - Suite 4035
Media, PA  19063

(484) 444-4400
(484) 444-0774 (fax)
*www.bilottilaw.com*

ANTHONY J. BILOTTI
COLIN M. VROOME
J.B. TODD McCOY
ANDREA WEAVER*
CHRISTINA A. EUNSON*
ELIZABETH G. GEE*
*ROSS GOREN*
*ALSO ADMITTED IN NJ

DIRECT DIAL (484) 444-4416
AJB@BILOTTILAW.COM

Princeton Corporate Center
5 Independence Way
Suite 300
Princeton, NJ  08540
(609) 945-2525
(609) 945-2528 *(fax)*

*Please Reply to Media Office*

July 10, 2015

Gerald Jay Pomerantz
21 S. 12th St., 7th Fl.
Philadelphia, PA  19107

> **Re:   *Sherman Hart v. The Coca-Cola Company***
> ***WCAIS Claim No. 7417594***

Dear Mr. Pomerantz:

This will confirm that we have scheduled the oral deposition of Lawrence Goren, M.D., for July 23, 2015 at 10:00 a.m., in the above-captioned matter.  A signed Subpoena from Judge Rago as well as Notice of Deposition is enclosed.

Very truly yours,

Anthony J. Bilotti
for Anthony J. Bilotti & Associates, LLC

AJB/bm
Enclosure
00169609.DOC



DEPOSITION
EXHIBIT
L-GOREN-1
J.C.  7.23.15

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF LABOR AND INDUSTRY
BUREAU OF WORKERS' COMPENSATION
OFFICE OF ADJUDICATION

SHERMAN HART                           :
                                       :
         v.                            :          BUREAU CLAIM #7417594
                                       :
PHILADELPHIA COCA-COLA                 :

## NOTICE OF ORAL DEPOSITION

TO:    Gerald Jay Pomerantz              Lawrence Goren, M.D.
       21 S. 12th St., 7th Fl.           OnSite Innovations
       Philadelphia, PA  19107           5725 E. Erie Ave
                                         Philadelphia PA  19134

Please take notice that the undersigned will take the Oral Deposition of the person identified below on the date and at the time and place indicated below, pursuant to the Special Rules applicable thereto.

        DEPONENT:        Lawrence Goren, M.D.

        DATE & TIME:     July 23, 2015 at 10:00 a.m.

        LOCATION:        Anthony J. Bilotti, Anthony J. Bilotti & Associates, LLC,
                         Rose Tree Corporate Center - Bldg. II,
                         Ste. 4035, 1400 N. Providence Rd., Media, PA 19063

You may object to this Oral Deposition by mailing or delivering a letter listing your objections to **Anthony J. Bilotti, Anthony J. Bilotti & Associates, LLC, Rose Tree Corporate Center - Bldg. II, Ste. 4035, 1400 N. Providence Rd., Media, PA 19063** at least ten (10) days before July 23, 2015.

                         ANTHONY J. BILOTTI & ASSOCIATES, LLC


                By:      _____
                         Anthony J. Bilotti
                         Attorneys for Defendant

Dated: July 8, 2015
cc:    The Honorable Tina Marie Rago
       Brusilow & Associates
00169604.DOC

ONSITE INNOVATIONS@CCR MEDICAL SERVICES
725 East Erie Avenue
Philadelphia, PA 19134

Phone: 215-427-6986
Fax: 215-291-1715
email:dcortez@onsite-innovations.com

**Sherman Hart**

DOV:     10/22/2014
DOB:     12/09/1982
DOI:     10/22/2014
Claim #:   30142951559-0001

S:      Sherman presents today for initial evaluation.  He states that early this morning while performing his duties in the warehouse he was lifting a case of products and his left foot caught in plastic of the pallet and when he pushed it to move the case he had picked up he felt pain to the lower back and into the groin.  He presents now with a complain of pain to the right lower back with radiation into the right groin and leg and no paresthesias.  He was initially evaluated at Aria Frankford Campus and given an injection of Toradol and a prescription of Toradol and Flexeril before release.  He reports a history of a previous MVA approximately two years ago with the lower back injury he states.  There is no history of herniated disc at that time.  He has taken no oral medications but did apply topical Icy-Hot to the lumbar spine without relief.

O:      Sherman is listing to the right on ambulation and when sitting.  He complains of tenderness to palpation to the right paravertebral musculature of the lumbar spine without spasms palpable.  He has very limited active range of motion in all planes due to complaints of pain throughout.  Sitting Root and CVAT is negative.  Straight leg raise to the left lower extremity elicits complaints of pain to the right lumbar spine.  Straight leg raise to the right lower extremity elicits complaints of pain to the right lumbar spine.  There are no radicular complaints to either extremity on these maneuvers.  Sitting Root to the left lower extremity elicits complaints of pain to the left lumbar spine and to the right lower extremity to the right lumbar spine.  There are no radicular complaints with Sitting Root testing.  Sherman is able to walk on his heels and toes normally.  DTRs are normal and muscle strength is normal to lower extremities.  Pedal pulses and sensation is intact throughout.

A:      Lumbar strain/sprain.

P:      Sherman is placed on modified duty at this time.  He was given Naprosyn 500 mg to be taken one twice daily with food.  He was also given methocarbamol 500 mg to be taken one-half to one tablet at bedtime as needed.  Possible side-effects, adverse reactions and precautions of both medications were reviewed.  He is scheduled to follow up on 10/28/14 and may contact the clinic should he have any questions or concerns between now and then.

DEPOSITION
EXHIBIT
D-60X5N-21
JC  7.23.15
PENGAD 800-631-6989

ONSITE INNOVATIONS@CCR MEDICAL SERVICES
725 East Erie Avenue
Philadelphia, PA 19134

Phone: 215-427-6986
Fax: 215-291-1715
email:dcortez@onsite-innovations.com

Debra A. Cortez, PA-C

Lawrence J. Coren, MD

DAC/mm          Doc#24206909

ONSITE INNOVATIONS@CCR MEDICAL SERVICES
725 East Erie Avenue
Philadelphia, PA 19134

Phone: 215-427-6986
Fax: 215-291-1715
Email:dcortez@onsite-innnovations.com

## WORK STATUS REPORT

**DEPOSITION EXHIBIT**
D Goren - 3
T.C. 7-15-15

| DATE: | 10/22/14 | NAME: | Sherman Hart |
|---|---|---|---|

| Cl# | 3014205155-000 / | DOI: | 10/22/14 | Dx: | Lumbar S/S |
|---|---|---|---|---|---|

**WORK STATUS:** Modified duty

**RESTRICTIONS:**

MAX LIFT:  0  LBS.      MAX CARRY:  0   LBS   MAX PUSH/PULL:  0   LBS

RIGHT ARM/LEFT ARM/BOTH   GRASPING:   NONE/LIGHT ONLY/LIMITED/NO LIMIT

BEND AT WAIST: NONE/LIMITED/NO LIMIT   SIT/STAND/WALK:  NONE/LIMITED/AS TOLERATED/NO LIMIT

CLIMBING LADDERS:   NONE/LIMITED/NO LIMIT

DRIVING:  NONE/MAY DRIVE TRUCK/FORK LIFT ONLY/NO LIMIT

OTHER:  HEP

**REFERRALS:**

| NEXT APPT AT COCA-COLA MEDICAL: | 10/28/14 | TIME: | 3:30 PM |
|---|---|---|---|

I understand the above work status/restrictions and instructions. Copies of this form have been provided to me for my supervisor and myself.

EMPLOYEE SIGNATURE _Sherman Hart_          DATE 10-22-14

_Debra A. Cortez signature_          DATE: 10/22/14
Debra A. Cortez, PA-C / Lawrence Goren, MD

Classified - Internal use

Revised 9/23/14

D Goren - 3

**ONSITE INNOVATIONS@CCR MEDICAL SERVICES**
725 East Erie Avenue
Philadelphia, PA 19134

Phone: 215-427-6986
Fax: 215-291-1715
Email:dcortez@onsite-innnovations.com

DEPOSITION
EXHIBIT
~Goren~-4~
SC. 7.23 15

## WORK STATUS REPORT

| DATE: | 10/29/14 | NAME: | Sherman Hart |
|---|---|---|---|

| CL# | 30142951559-0001 | DOI: | 10/22/14 | Dx: | Lumbar S/S |
|---|---|---|---|---|---|

**WORK STATUS:** Modified duty

**RESTRICTIONS:**

MAX LIFT: 0   LBS.   MAX CARRY: 0   LBS   MAX PUSH/PULL: 0   LBS

RIGHT ARM/LEFT ARM/BOTH   GRASPING: NONE/LIGHT ONLY/LIMITED/NO LIMIT

BEND AT WAIST: NONE/LIMITED /NO LIMIT   SIT/STAND/WALK: NONE/LIMITED/AS TOLERATED/NO LIMIT

CLIMBING LADDERS: NONE/LIMITED/NO LIMIT

DRIVING: NONE/MAY DRIVE TRUCK/FORK LIFT ONLY/NO LIMIT

OTHER: HEP

**REFERRALS:**

| NEXT APPT AT COCA-COLA MEDICAL: | 10/31/14  Dr. Goren | TIME: | 9:00 AM |
|---|---|---|---|

I understand the above work status/restrictions and instructions. Copies of this form have been provided to me for my supervisor and myself.

EMPLOYEE SIGNATURE _____   DATE 10-29-14

_____   DATE: 10/29/14

Debra A. Cortez, PA-C / Lawrence Goren, MD

Revised 9/23/14

Classified – Internal use

D Goren-4

**11/26/14    SHERMAN HART**
                **Claim #301429515590001**

Sherman is doing a little bit better. He mostly complains of significant stiffness and low back pain when he is up and bending repetitively.

His exam reveals that he has tightness in the lumbar paraspinals with pain at the end range of flexion and extension limited to 5 degrees. He has very tight hip flexors. Hamstrings are not tight. He has no neurologic findings and negative straight leg raising exam.

He is heavily muscled, but extremely tight and very tight when he gets through forward flexion. We will continue him on modified duty. We will continue him in PT with stretch and using a stim unit. I will see him in 2 weeks.

Lawrence J. Goren, M.D.
LJG:lal

DEPOSITION
EXHIBIT
D-GOREN-5
J.C. 7.23.15

ONSITE INNOVATIONS@CCR MEDICAL SERVICES
725 East Erie Avenue
Philadelphia, PA 19134

Phone: 215-427-6986
Fax: 215-291-1715
Email:dcortez@onsite-innnovations.com

## WORK STATUS REPORT

DEPOSITION
EXHIBIT
*P GOREN-C*
*DC. 7.23.15*

| DATE: | 11/26/14 | NAME: | Sherman Hart |
|---|---|---|---|

| CL# | 30142951559-0001 | DOI: | 10/22/14 | Dx: | Lumbar S/S Groin S/S |
|---|---|---|---|---|---|

WORK STATUS:  Modified duty

RESTRICTIONS:

MAX LIFT:    20    LBS.    MAX CARRY:    20   LBS    MAX PUSH/PULL:    20    LBS

RIGHT ARM/LEFT ARM/BOTH    GRASPING:    NONE/LIGHT ONLY/LIMITED/NO LIMIT

BEND AT WAIST: NONE/LIMITED/NO LIMIT    SIT/STAND/WALK:  NONE/LIMITED/AS TOLERATED/NO LIMIT

CLIMBING LADDERS:    NONE/LIMITED/NO LIMIT

DRIVING:    NONE/MAY DRIVE TRUCK/FORK LIFT ONLY/NO LIMIT

OTHER:  Continue PT

REFERRALS:

| NEXT APPT AT COCA-COLA MEDICAL: | 12/17/14 | TIME: | 6:00 PM |
|---|---|---|---|

I understand the above work status/restrictions and instructions. Copies of this form have been provided to
me for my supervisor and myself.

EMPLOYEE SIGNATURE _____    DATE 11/24/14

_____    DATE: 11 Dec/14
Debra A. Cortez, PA-C / Lawrence Goren, MD

*D. Goren-6*
Revised 9/23/14

Classified - Internal use

**ONSITE INNOVATIONS@CCR MEDICAL SERVICES**
725 East Erie Avenue
Philadelphia, PA 19134

Phone: 215-427-6986
Fax: 215-291-1715
Email:dcortez@onsite-innnovations.com

Date: 1/13/15

To: Sherman Hart
Re: Claim # 30142951559-0001
DOI: 10/22/14

There have been several attempts to reach you in order to re-schedule the follow-up appointment you missed on 12/17/14.  Please contact CCR Medical Services to discuss your claim and reported injury. Failure to comply with this request by 1/19/15 may result in discharge from our care, as we can only deduce that you are no longer in need of medical services for your reported injury.

A copy of this letter has been forwarded to your supervisor and insurance adjuster at Sedgwick CMS for their records.

Thank you,

Debra A. Cortez, PA-C

